SOUTHERN DISTRICT OF NEW YORK
------------------------------x

Emmanuel Agropong, et al.,

               Plaintiffs,

        v.                     14 Cv. 7990 (RWS)

Michael Memon, et al.,

               Defendants.

------------------------------x
                         New York, N.Y.
                         September 30, 2015
                         12:30 p.m.

Before:

               HON. ROBERT W. SWEET,

                         District Judge

                 APPEARANCES

THE MARLBOROUGH LAW FIRM, P.C.
     Attorneys for Plaintiffs
CHRISTOPHER MARLBOROUGH

SLATER SLATER SCHULMAN, LLP
     Attorneys for Plaintiffs
JONATHAN E. SCHULMAN

LAW OFFICES OF MICHAEL K. CHONG
     Attorneys for Defendants
MICHAEL K. CHONG
FELICIA CORSARO

 1          MR. MARLBOROUGH:  Good afternoon, your Honor.

 2   Christopher Marlborough for the plaintiffs.  My cocounsel

 3   stepped away, and my adversary is not here at the moment, but

 4   he is in the building.

 5          THE COURT:  How about the defendant?

 6          MR. MARLBOROUGH:  The defendant is here, yes.  The

 7   actual defendants?  I've seen them in the building.

 8          THE COURT:  No, defense counsel.

 9          MR. MARLBOROUGH:  Defense counsel is here, your Honor.

10   They are just outside the courtroom.  Here they come.

11          THE COURT:  What does the plaintiff want to do?

12          MR. MARLBOROUGH:  Well, we wanted to --

13          THE COURT:  I know what you want.  What do you want to

14   do today?

15          MR. MARLBOROUGH:  We wanted to present some witnesses

16   and some audio recording testimony.

17          THE COURT:  Okay, fine.  Go ahead.

18          MR. CHONG:  Your Honor, before we proceed, I was going

19   to ask if we can have a conference with your Honor as to this

20   particular hearing, this motion --

21          THE COURT:  Yes.

22          MR. CHONG:  -- and just discuss some of the procedure

23   that we're going to be discussing.

24          THE COURT:  What's your problem?

25          MR. CHONG:  Well, they've brought a number of people

1    here.  I don't know who's going to be testifying today or who

2    is a witness.

3              THE COURT:  Neither do I.  I have some affidavits.

4    One presumes that the people who submitted affidavits are going

5    to testify, but I don't know.  I'm sure that counsel will tell

6    us, if that's your problem.  Any other problems?

7              MR. CHONG:  Well, I have concern about this recording

8    that they're seeking to present.

9              THE COURT:  We'll worry about that when we get to it.

10   What else?

11             MR. CHONG:  That's it, your Honor.  Those are some of

12   my major concerns.

13             THE COURT:  Counsel, let me ask you.  Who are you

14   going to put on?

15             MR. MARLBOROUGH:  We'd like to put on Keletso Tebogo,

16   he's a plaintiff, we have Sergio Recinos, and we're going to

17   call defendant Mike Memon as well.

18             THE COURT:  Okay.  Go ahead.

19             MR. MARLBOROUGH:  Your Honor, if I may, I do need to

20   plug in in order to get the audio recording to play.

21             MR. CHONG:  Your Honor, I'm sorry.  Before he plays

22   this tape, am I going to be heard on this tape as to whether it

23   should be played in court today?

24             THE COURT:  As I understand it, this is a motion for

25   contempt.  I don't know what this is.  I agree.

1          What is it that you want to play, and what is it, and

2   how are you going to get it in?

3          MR. MARLBOROUGH:  Well, your Honor, the two witnesses

4   that I called, there's two audio recordings.

5          THE COURT:  Well, somebody made it.

6          MR. MARLBOROUGH:  Our clients recorded those

7   conversations with the defendants, yes.

8          THE COURT:  Presumably, you want to put the person who

9   made the recording on the stand so it can be examined.

10          MR. MARLBOROUGH:  That's correct.

11          THE COURT:  Let's do it.

12          MR. MARLBOROUGH:  Okay.

13          THE DEPUTY CLERK:  Please raise your right hand.

14          You do solemnly swear that the testimony you shall

15   give this Court in this issue now shall be the truth, the whole

16   truth, and nothing but the truth, so help you God?

17          THE WITNESS:  Help me God.

18          THE DEPUTY CLERK:  Please state your full name and

19   spell your first name and last name slowly for the record.

20          THE WITNESS:  Keletso Tebogo.  K-e-l-e-t-s-o,

21   T-e-b-o-g-o.

22          COURT CLERK:  Thank you, sir.  Please be seated.

23                        DIRECT EXAMINATION

24   BY MR. MARLBOROUGH:

25   Q.  Good afternoon, Mr. Tebogo.

1    A.  Good afternoon, sir.

2    Q.  How did you become acquainted with this case?

3    A.  I joined this case this May.

4    Q.  Why did you decide to join the case?

5    A.  Because of minimum wage.  I have never been paid a minimum

6    wage, and there were some guys who were not treated the right

7    way after joining the case.

8    Q.  How were those people not treated the right way?

9    A.  How is?

10   Q.  You said there were some people that were not treated in

11   the right way?

12   A.  Yes.

13   Q.  How were they not treated in the right way?

14   A.  They were giving them hard time all the time because of

15   joining the lawsuit, being part of the case.

16   Q.  Are you employed by defendants?

17   A.  Yes.

18   Q.  How long have you worked for them?

19   A.  Since 2005.  This is the tenth year.

20   Q.  What is the nature of the business?

21   A.  This is a discount -- this is a multiple -- what do you

22   call?  It's a lot of company -- it's like a corporation with a

23   lot of stores.

24   Q.  Is it a chain?  Is that the word you're looking for?

25   A.  It's a chain, yeah.

1   Q.  Have you worked at a number of the stores?

2   A.  Yes.

3   Q.  Have you worked at all the stores?

4   A.  All of the stores, yes.

5   Q.  Do you know who Mike Memon is?

6   A.  I know who Mike Memon is.

7   Q.  How do you know Mike Memon?

8   A.  Mike Memon is the owner.

9   Q.  How long have you known him?

10  A.  Since I worked for the company, the past 10 years.

11  Q.  Has he understood the English language as long as you've

12  known him?

13  A.  He has been speaking English language, yes.

14          MR. CHONG:  Objection.

15          THE WITNESS:  Plenty, ever since I've known him.

16  Q.  Has he used the name Mike Memon as long as you've known

17  him?

18  A.  Yes.

19  Q.  Do you know who Mohamed Doria is?

20  A.  I know who Mohamed Doria is.

21  Q.  Who is that?

22  A.  He is the co-owner of the company.

23  Q.  Is Mohamed deceased?

24  A.  Yes, he is.

25  Q.  Was he your boss?

 1   A.  He was the boss.  The big boss.

 2   Q.  How long have you known him?

 3   A.  I knew him until his passing.  Since 2005 until last year,

 4   the 30th of August, you know, until his passing.

 5   Q.  He passed when, did you say?

 6   A.  The 30th of August.

 7   Q.  Did he give you instructions as to how to perform your

 8   work?

 9   A.  Yes.

10   Q.  Did he give other workers instructions?

11   A.  Yes.

12   Q.  Did he have an influence over the amount that you were

13   paid?

14   A.  Yes.

15   Q.  Were there any management changes after Mohamed died?

16   A.  Yes.

17   Q.  What were those?

18   A.  After Mohamed died, his brothers took over for his family.

19   Because this is a partnership.  His brothers took his position.

20   Q.  Were some of the brothers already involved in the business?

21   A.  Yes, all of them.

22   Q.  Who were those people?

23   A.  There is Mr. Gulan.  There is --

24   Q.  I'm sorry.  Say that again.

25   A.  Mr. Gulan.

 1   Q.   Gulan?

 2   A.   Yes.

 3   Q.   All right.  Can you spell that?

 4   A.   G-u-l-l-u-m.

 5   Q.   Is that the last name?

 6   A.   Doria.

 7   Q.   Anyone else?

 8   A.   There is Mr. Usman.

 9   Q.   What's the last name?

10   A.   Is Doria.

11   Q.   Okay.

12   A.   There is Mr. Salim Doria.  There's Sikander Doria and Abdul

13   Doria.

14   Q.   Do you know someone named Musajee?

15   A.   Yes, I know Musajee.  He is the manager.  He is the general

16   manager.

17   Q.   Is he a relative of the Doria family as well?

18   A.   Yes.  There is the brother-in-laws and the daughters.

19   Q.   Do you know someone named Siraj?

20   A.   I know Siraj.

21   Q.   Do you know Siraj's last name?

22   A.   No, I don't know his last name.

23   Q.   Is he a member of the Doria family as well?

24   A.   Yes.

25   Q.   Is he a manager of the stores?

 1   A.  Yeah.  He's a manager, yes.

 2   Q.  Do you know someone name Behlal Doria?

 3   A.  Yes, I know Behlal.

 4   Q.  What does Behlal do for a living?

 5   A.  Behlal -- how does Behlal doing?

 6   Q.  What does he do for a job?

 7   A.  He is with the phone company.

 8   Q.  Have you ever met a person named Luckenson Camille?

 9   A.  I did many times.  I also worked with him before.

10   Q.  Please repeat that.

11   A.  I also worked with him before.

12   Q.  You worked with him before?

13   A.  Yeah, before, yes.

14   Q.  When was the last time you saw Luckenson Camille?

15   A.  That was around in May.

16   Q.  What were the circumstances?

17   A.  He was called by Mr. G to come to the pier for the

18   Pierre-Louis brothers so that he could give them pressure to

19   withdraw from the case.

20   Q.  Who were the brothers?

21   A.  The Pierre-Lou brothers.  Josue and Peter.

22   Q.  Okay.

23   A.  Yeah.

24   Q.  He was given to pressure them?

25   A.  So that they can withdraw from the case.

1   Q.  By who?

2   A.  By Mr. G.

3           MR. CHONG:  Objection, hearsay, your Honor.

4   BY MR. MARLBOROUGH:

5   Q.  How do you know that?

6   A.  He told me.

7           THE COURT:  I'll let it stand.

8   BY MR. MARLBOROUGH:

9   Q.  He told you --

10  A.  Yes.  Together with some other colleagues, because he met

11  us and he told us why he came there.

12  Q.  Did he say what he was going to do after this conversation?

13  A.  Yes.  He said that he has to do what they told him to do.

14  Q.  He said that he intended to do what they told him to do?

15  A.  What they told him to do, that's why they have to do.

16  Q.  What was that that he said he intended to do?

17  A.  He said he was going to make sure that they withdraw from

18  the case.  He was going to give them pressure so that they

19  withdraw from the case.  Ever since that, I never saw them

20  again.  I don't know what they said to them.

21  Q.  Are you aware of other workers who have suffered pressure

22  to withdraw from the case?

23  A.  Yes.

24  Q.  Are you one of those people?

25  A.  Yes.

F9UQAGR11                        Tobacco - direct

11

1   Q.   Did you have a conversation with Mike Memon at any point

2   about the case?

3   A.   I had a conversation with Mike Memon, yes.

4   Q.   What was the nature of that?

5   A.   Mr. Mike Memon wanted me to withdraw from the case and want

6   me to write a false letter to submit to court.

7   Q.   What was your response to that?

8   A.   I told him that I'm not going to sign that booklet.

9   Q.   Who was present during that conversation?

10  A.   It was me, a colleague of mine, Madi Nasoco, Mr. Mike

11  Memon, and Mr. Usman Doria.

12  Q.   And Usman Doria was with Mike on this issue?

13  A.   They were together.

14  Q.   And what was -- Maddi Nasoco, was that the person's name?

15  A.   Yes.

16  Q.   What was Maddi Nasoco's position on pattern this issue?

17  A.   Maddi Nasoco was also pressured to write the letter and

18  that time he refused to write it too.

19  Q.   He refused to write the letter?

20  A.   Yes.

21  Q.   And you refused to write the letter?

22  A.   Yes.

23  Q.   At the end of that conversation, how were things left?

24  A.   I told them that I would think about it.

25  Q.   Okay.

1   A.  Yes.

2   Q.  Did you think about it?

3   A.  I thought about it, because I never wrote it.  Because

4   whatever they were telling me --

5   Q.  So you thought about it and decided not to write it?

6   A.  Yes.  Because everything he was telling that paperwork not

7   true, so I was not supporting it.

8           MR. MARLBOROUGH:  Your Honor, I'd like to admit into

9   evidence -- we've submitted a compact disk version of this

10  audio recording to the Court, and we have --

11  Q.  Did you record that conversation?

12          MR. MARLBOROUGH:  I apologize.  I realized I had left

13  a foundational element out.

14          THE COURT:  It's a recording.  Who made it?  Under

15  what circumstances?

16          MR. MARLBOROUGH:  Correct.

17          THE COURT:  How has it gotten here, et cetera.

18          MR. MARLBOROUGH:  Right.

19  Q.  Did you record that conversation?

20  A.  I recorded the conversation.

21  Q.  How did you do it?

22  A.  I recorded it in my cellphone.

23  Q.  Under what circumstances?

24  A.  Because I didn't know what was going to happen, because

25  that time they were -- I have learned from a colleague of mine

1    that they were giving hard time to everybody who they saw their

2    name, and I had to record that so that I can know what was

3    going on, if it was good or not good.

4    Q.  Would you be able to identify the voices on that recording?

5    A.  100 percent, yes.

6           MR. MARLBOROUGH:  Your Honor, I'd like to admit that

7    into evidence.

8           THE COURT:  What is it that you have?  Do you have his

9    cellphone?

10          MR. MARLBOROUGH:  It's an electronic version of it.  I

11   believe we submitted it to the Court on a CD.

12          THE COURT:  How was that made?

13          MR. MARLBOROUGH:  It was made from whatever the audio

14   file is, MP3 file that is from the phone.  It's straight off of

15   the phone item.

16          THE DEPUTY CLERK:  Who did that?

17          MR. MARLBOROUGH:  The audio file was emailed to us.

18          THE COURT:  By?

19          MR. MARLBOROUGH:  Did you email the audio file to us?

20          THE WITNESS:  Yes, I emailed it, yes.

21          THE COURT:  Then you converted it to this disk?

22          MR. MARLBOROUGH:  Correct.

23          THE COURT:  And that's your testimony?

24          MR. MARLBOROUGH:  No.

25          THE COURT:  It's the validity of the --

1          MR. MARLBOROUGH:  Right.

2          THE COURT:  All right.  You received it from the

3    witness and just mechanically transcribed it onto a disc,

4    right?

5          MR. MARLBOROUGH:  That's correct.

6          THE COURT:  I'll admit it.

7          MR. MARLBOROUGH:  Thank you.

8          MR. CHONG:  Your Honor, am I going to have an

9    opportunity to question the witness as far as this

10   conversation?

11         THE COURT:  Sure.  On the subject of the tape, yes.

12         MR. CHONG:  Yes.

13         THE COURT:  Sure.

14                    VOIR DIRE EXAMINATION

15   BY MR. CHONG:

16   Q.  Mr. Keletso, why did you make this recording?  What was

17   your intent in making this recording?

18   A.  I made this recording because my colleagues found out they

19   were telling us that they were forced.

20   Q.  Who was forced?

21   A.  My colleagues.  The my coworkers who have entered this --

22   who were involved in the case, they was forced to withdraw from

23   the case.

24   Q.  So who initiated that conversation with Mike Memon?  Was it

25   you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Mr. Mike Memon called me to his office.

2   Q.  So when he called you to his office, were you holding your

3   cellphone in your hand; in your right hand or your left hand?

4   A.  My cellphone was in my pocket.

5   Q.  In your where?

6   A.  My pocket.

7   Q.  Your pocket.

8   A.  Yes.

9   Q.  So if your cellphone is in your pocket, you made the

10  recording when the cellphone was in your pocket?

11  A.  Yes.

12  Q.  Who else was in the office with you?

13  A.  That was Mr. Mike Memon, Mr. Usman Doria, me, and Mike

14  Nasu.

15  Q.  When you were making that recording and the phone was in

16  your pocket, how can the phone make a clear recording?

17  A.  It can make a clear recording, yes.

18  Q.  But if it's in your pocket, is the microphone right on --

19  literally on the phone?

20  A.  The microphone is where?

21  Q.  The microphone on the phone.  It's on the phone, correct?

22  A.  Yes.

23  Q.  So if you stick the phone in your pocket --

24  A.  Yes.

25  Q.  -- isn't that going to muffle the recording?

 1    A.  Yes.  It does, yes.

 2    Q.  So it's fair to say that the recording might not be clear,

 3    correct?

 4    A.  It's 100 percent clear.  100 percent clear.

 5    Q.  Did you know that your attorney submitted a transcript of

 6    that discussion and there are sections marked inaudible?

 7    A.  Yes.

 8    Q.  Did you know that there was 150 lines in that transcript

 9    marked inaudible?

10    A.  Yes.

11    Q.  You knew that.

12    A.  Yes.

13    Q.  So if it's marked inaudible, what does that mean?

14    A.  Marked inaudible.

15    Q.  Yes.  If the transcript has a line which is marked

16    inaudible, what does that mean?

17            There's also 150 lines or about -- how many lines is

18    that?  There's also lines in the transcript from your recording

19    that say "crosstalk".  What does crosstalk mean?

20    A.  Crosstalk.

21    Q.  What does that mean?  It's your recording.

22    A.  Yes, that's my recording, yes.

23    Q.  What does crosstalk mean?

24    A.  I think the best way is to play the recording so that we

25    can tell -- we will see the difference between everything.

 1   Q.   There are significant portions from the transcript from

 2   your attorney from your recording that say "foreign language".

 3   A.   Yeah.

 4   Q.   Was there a foreign language being spoken during that

 5   conversation?

 6   A.   The foreign language was spoken by Mr. Mike Memon and

 7   Mr. Usman Doria.   Those are the ones who can answer about that

 8   one.

 9   Q.   Did you speak in a foreign language to Mike Memon?

10   A.   Foreign language is what -- it was spoken between Mr. Memon

11   and Mr. Usman Doria.   I don't speak their language.

12   Q.   So you spoke English.

13   A.   Yes.

14   Q.   How long was the conversation?

15   A.   Over 20 minutes.

16   Q.   Over how long?

17   A.   Over 20 minutes.

18   Q.   22 minutes?

19   A.   Over 20 minutes.

20   Q.   Okay.

21   A.   Yes.

22   Q.   In exhibits submitted by your attorneys, Docket 102-2 on

23   the docket --

24            MR. CHONG:   Your Honor, could I have this marked?

25   Judge?

 1              THE COURT:  I don't have it.  I don't have anything.

 2              MR. CHONG:  Could I have this exhibit marked and can I

 3    show it to the witness?

 4              THE COURT:  Sure.  How do you want to mark it?

 5              MR. CHONG:  We'll mark this as D1.

 6              THE COURT:  Okay.

 7              MR. CHONG:  Can I approach and show this to the

 8    witness?

 9              THE COURT:  Sure.

10    BY MR. CHONG:

11    Q.  Mr. Keletso, do you recognize this document?

12    A.  Yes.

13    Q.  Can you tell me what it is?

14    A.  This is the transcript of the audio.

15    Q.  Okay.

16    A.  Yes.

17    Q.  Can you flip through it and make sure that's the transcript

18    of your audio?

19    A.  You want me to go through everything?

20    Q.  I want you to look through the entire document and confirm

21    that that's the transcript from your audio tape.

22    A.  That, I went to it before.  So you want us to go through

23    the tape?

24    Q.  No.  I want you to look through the document and confirm

25    that that's the transcript from your audio recording.

1  A.  Yes.  I went through it before already.

2  Q.  Okay, good.  All right.  So take a look at this first

3  page here.  The first person identified, it says "Unknown".

4         Who is that -- why is that -- who is that person

5  unknown?

6  A.  This one I can only tell if the audio is on so that I can

7  identify the voices.

8  Q.  Okay.

9  A.  Yes.

10 Q.  So you have no idea --

11 A.  There are the times when I was working down there when my

12 camera was on.  So there are the people who with us talking.

13 Q.  So you don't know who's speaking there?

14 A.  Some of the people were the people inside the store,

15 because I was working where they were people until I worked

16 where I was caught.

17 Q.  So in lines 1 through 7, the speaker is identified as

18 "Unknown".  Do you know who was speaking there?

19 A.  Listen, when I was -- my phone was in my pocket.  So I was

20 working with my phone on, so there were people talking around.

21 So those are another part of the conversation.

22 Q.  I'm going to turn two page 3, line 8.  What does that say

23 in blue highlight right there?

24 A.  "You're recording me.  You go like this.  I have a hearing

25 tomorrow.  Okay?"

1    Q.  Can you read this?  Do you understand what that says?

2    A.  Yes.

3    Q.  What does that --

4    A.  I understand.

5    Q.  What does that say?

6    A.  This we can only tell if it's in the audio, because I don't

7    know what all this is.

8    Q.  Okay.  So that says "inaudible", correct?

9    A.  That's what they do, yes.

10   Q.  Okay.  What about line 23?  Does this say "inaudible", as

11   well?

12   A.  Which one.

13   Q.  Right there where my finger is on line 23.  Does that say

14   "inaudible"?

15   A.  Yes.

16   Q.  Page 4, line 8.  Does that say "inaudible" right there?

17   A.  That is -- yes.

18   Q.  Okay.

19           MR. MARLBOROUGH:  Your Honor, I don't think these

20   questions relate to the minimal foundation requirements for us

21   to be able to listen to the tape.

22           THE COURT:  Sustained.

23           MR. CHONG:  Your honor, it goes to the quality of the

24   recording.

25           THE COURT:  Okay, good.

1   BY MR. CHONG:

2   Q.   Can you explain to me, after you recorded this

3   conversation --

4   A.   Yes.

5   Q.   -- what did you do with the recording next?

6   A.   I listened to the recording, and I emailed it so that they

7   can filter.

8   Q.   Who did you email it to?

9   A.   I emailed it to my attorneys.

10   Q.   To who?

11   A.   My attorneys.

12   Q.   Which attorney?

13   A.   All of them.

14   Q.   Who is all of them, so we're clear?

15   A.   Okay.

16   Q.   Because we need to get a chain of custody.

17   A.   Okay.   I emailed it to Christopher.

18   Q.   Is there anybody else that you emailed it to?

19   A.   He have to -- I told him to do it to other lawyers too.

20   Q.   Okay.

21   A.   Yes.

22   Q.   Who did this transcription -- this document right here, who

23   typed out the this transcription of the audio?

24   A.   They did it and they call me and I confirmed.

25   Q.   After you sent the audio to your -- what was the date that

 1   you sent this audio to your attorney?

 2   A.   That was a day before -- before -- that was the day before

 3   they were supposed to go to court and the court was postponed.

 4   Q.   What day was that?

 5   A.   That was -- oh, the date?  But that was the day before the

 6   Court.  Because Mr. Mike, in the audio, he say, "I am going to

 7   court tomorrow."  That was the time he was supposed to go to

 8   the courts.

 9   Q.   Well, how many days before that court date was this

10   recording made?

11   A.   It was a day before -- it was -- the following day was

12   supposed to be the court hearing.

13   Q.   So you're saying this recording was made before the court

14   hearing?

15   A.   Yes.

16   Q.   Are you referring to the May 21st court hearing?

17   A.   The date was -- oh, the time they postponed the court.  I'm

18   not sure exactly about the date, but I know it was around May,

19   yes.

20   Q.   So was that your motivation to make that recording, because

21   you knew there was a court date the next day?

22   A.   I wanted to see whether the defendants are following the

23   lines which were given to them by the judge.

24   Q.   I'm sorry?

25   A.   I wanted to see -- I was recording so that we can see if

1    they are going through the lines they were given, the orders

2    they were given by the judge.

3    Q.  Did anybody tell you to make that recording?

4    A.  Nobody told me.

5    Q.  Has this recording been edited by anybody?

6    A.  Nobody edited the audio.  It's 100 percent.

7    Q.  How do you know that?

8    A.  Because I listened to it.  I recorded it, and everything is

9    like that, 100 percent.

10   Q.  Do you know if your attorney had the tape or the recording

11   sent to any outside parties for review or editing or recording?

12   A.  Do I know what?

13   Q.  Do you know if the tape was sent to any third parties other

14   than your attorney?

15   A.  No.

16   Q.  Did your attorney send it to anybody?

17   A.  They -- yes.  They talked about -- they talked to me about

18   it and I authorized it.  They were asking if they can do it,

19   and I say if they want to do it that they can do it, no

20   problem.

21   Q.  Do what?

22   A.  If somebody need to do it -- you know, they had to ask

23   me -- I say, "We ever need it, they can transfer it because

24   it's 100 percent."  I -- you know.

25   Q.  What kind of cellphone do you have?

```
 1    A.  Samsung S4.

 2    Q.  So how long is the recording time on your S4?

 3    A.  It depends on the memory too.

 4    Q.  Is that the phone that you had at the time you made this

 5    recording?

 6    A.  That time I didn't have a -- I had a lot of space in my

 7    memory, in my phone memory.

 8    Q.  Is it the same phone?

 9    A.  Yes.

10    Q.  Do you always record conversations with a phone in your

11    pocket?

12    A.  Yes.

13    Q.  What other conversations do you record when your phone is

14    in your pocket?

15    A.  Any conversation I want to record, I can record.

16    Q.  After you made that recording, how long was it before you

17    sent it to your attorney?

18    A.  After I reviewed it.

19    Q.  So was that one hour later, or ten days later, a week

20    later?

21    A.  No, that was an hour later.

22    Q.  An hour later.

23    A.  Yes, about an hour.  Even maybe less than an hour later.

24    Q.  So an hour later after that conversation, you sent it to

25    your attorney, Chris Marlborough.
```

1   A.  Yes, so that they can review it.

2           MR. CHONG:  Your Honor, I have nothing further.

3           Based on the witness's testimony, your Honor, it's

4   questionable of whether the audio tape is accurate.  The

5   witness has testified that he had this cellphone, which is

6   not --

7           THE COURT:  I heard it.  I've been here.  Yes.  Okay.

8           What's next?

9           MR. MARLBOROUGH:  Your Honor, the tape is -- you said

10  it was more than 20 minutes long, Mr. Tebogo?

11          THE WITNESS:  Yes.

12          MR. MARLBOROUGH:  We could play portions of the tape

13  or we can play --

14          THE COURT:  Do you want it admitted into evidence?

15          MR. MARLBOROUGH:  We'd like to admit it into evidence,

16  your Honor.

17          THE COURT:  How would you like to designate it?

18          MR. MARLBOROUGH:  Plaintiff's 1.

19          THE COURT:  It's admitted, and we'll be in recess

20  until 2:15.

21          MR. MARLBOROUGH:  Thank you, your Honor.

22          (Recess)

23          MR. MARLBOROUGH:  Your Honor, plaintiffs would like to

24  recall Mr. Tebogo following the short break.

25          THE COURT:  Good afternoon.  You're still under oath.

 1                THE WITNESS:  Yes.

 2                     DIRECT EXAMINATION CONTINUED

 3   BY MR. MARLBOROUGH:

 4   Q.  Please have a seat on the stand.

 5          Mr. Tebogo, the Judge just said you're still under

 6   oath, meaning we don't need to have you sworn in again, but we

 7   are going to ask you some more questions.

 8   A.  Okay.

 9   Q.  The judge had admitted into evidence the recording right

10   before the break, and now I want to play some of that for you

11   and ask you some questions about it.  Okay?

12   A.  Yes.

13   Q.  I'm going to pause at points during the playback to ask you

14   some questions.

15   A.  Yes.

16          (Audio played)

17   Q.  Do you recognize the person who said, "This is my name?"

18   A.  Yes.

19   Q.  Who is that person?

20   A.  That was me.

21   Q.  What was your name referring to?  What were you referring

22   to when you said, "This is my name?"

23   A.  Because he was holding the papers with my name, the case

24   papers.

25                MR. CHONG:  I'm sorry, your Honor, if I may.  Since

```
 1   he's playing this audio, could he refer to the section in the

 2   transcript that we all have in front of us?

 3              THE COURT:  No, we all do not have it in front of us.

 4   It hasn't been admitted.  I don't have it.

 5              MR. CHONG:  Well, we could mark this as an exhibit?

 6              THE COURT:  Counsel, do you want the transcript

 7   admitted?

 8              MR. MARLBOROUGH:  Yes, your Honor, we would like the

 9   transcript admitted.  I believe as Defendant's 1.

10              THE COURT:  Let me ask the defense.  Do you agree it's

11   an accurate transcript?

12              MR. CHONG:  Do I agree, your Honor?

13              THE COURT:  Yes.

14              MR. CHONG:  I have no way of knowing if it's an

15   accurate transcript, your Honor.

16              THE COURT:  Well, somebody's got to testify as to how

17   it was made.  I mean, do you want me to take it on faith?

18              MR. MARLBOROUGH:  No, we wouldn't.  We were going to

19   work off the audio.  He requested that we introduce the

20   transcript.

21              THE COURT:  You don't want to introduce the

22   transcript, right?

23              MR. CHONG:  Your Honor, I submit it as an exhibit.

24   I'd like to move it into evidence, that transcript.  It's, I

25   think, we marked it as D1.
```

 1          THE COURT:  Well, in other words, you agree that it's

 2   accurate?

 3          MR. CHONG:  No, I do not agree that it's accurate,

 4   your Honor, I'm merely submitting it as an exhibit.  I'd like

 5   to compare it to this audio transcript, which I've never heard.

 6          THE COURT:  Well, I guess the answer is, the state of

 7   this record, I guess I will not admit it.

 8          MR. SCHULMAN:  Your Honor, my name is Jonathan Shulman

 9   for the plaintiffs.  I'd like to try to get this admitted with

10   Mr. Tebogo.

11                    VOIR DIRE EXAMINATION

12   BY MR. SCHULMAN:

13   Q.  Mr. Tebogo?

14   A.  Yes, sir.

15   Q.  The transcript that defense counsel asked you about, I have

16   a copy of that in my hand.

17   A.  Yes.

18   Q.  Do you know what this is?

19   A.  Yes.

20   Q.  It says here it is a transcription of a May 20, 2015

21   conversation between Keletso Tebogo, Maddi Nasoco, Defendant

22   Michael Memon, and Usman Doria.

23   A.  Correct.

24   Q.  Have you reviewed this?

25   A.  I did, yes.

 1  Q.  When did you review it?

 2  A.  I'm not sure about the date, but I reviewed it before, yes.

 3  Q.  Do you know what this was transcribed from?

 4  A.  Yes, from the audio.

 5  Q.  From the audio.  Which audio?

 6  A.  The one which it was me, Mr. Memon, Mr. Maddi, and

 7  Mr. Usman Doria.

 8  Q.  Do you believe that this accurately represents the audio

 9  recording that Mr. Marlborough plans to introduce?

10  A.  100 percent.

11          MR. SCHULMAN:  Your Honor, may I admit this Defense

12  Exhibit 1 as Plaintiff's Exhibit 1, as well?

13          THE COURT:  Well, Plaintiff's 1 is the tape.  1T is

14  the transcript.  It's admitted.

15          MR. SCHULMAN:  Thank you, your Honor.

16          MR. MARLBOROUGH:  I'm going to play a portion of the

17  audio recording starting at the two minutes end.

18          THE COURT:  May I have a copy?

19          MR. MARLBOROUGH:  Of the audio recording?

20          THE COURT:  No, of the transcript.  This is the

21  transcript attached to the affidavit, counsel's affidavit,

22  right?

23          MR. SCHULMAN:  Yes, your Honor.

24          THE COURT:  Okay.  Yes.

25          MR. CHONG:  Your Honor, before he plays this, can he

1   reference the part of the transcript, now that your Honor has

2   it, so that we can follow what sections he's referring to?

3          THE COURT:  Well, at the moment, we just had the

4   opening session.  Go ahead.

5          MR. MARLBOROUGH:  I'm playing a portion of the

6   transcript from 240.57, and I'm asking Mr. Tebogo to identify

7   the voices for the moment.

8          (Audio played)

9   Q.  When you said that, "This is my name," that's you?

10  A.  Yes, that was me.

11         (Audio played)

12  Q.  Who asked you if you signed it?

13  A.  That was Mr. Mike Memon.

14         (Audio played)

15  Q.  Is there a reference on this tape to two criminals?

16  A.  Yes.

17  Q.  Do you know who the two criminals refers to?

18  A.  No.

19         (Audio played)

20  Q.  Who is Mr. G?

21  A.  Mr. G is Mr. Gulan Doria.

22  Q.  He's a defendant in this case?

23  A.  Yes, he is.

24         (Audio played)

25  Q.  Is that Mr. Mike asking you questions about your attorney?

 1    A.   That was Mr. Mike, sir.

 2    Q.   Are you aware that there was a temporary restraining order

 3    in place at the time concerning statements --

 4    A.   Yes.

 5    Q.   -- about your participation in a lawsuit and with your

 6    attorneys?

 7    A.   Yes.

 8    Q.   Do you have reason to believe that Mr. Mike was aware of

 9    that?

10    A.   Yes.

11             MR. CHONG:   Objection.

12             THE WITNESS:   Yes.

13    Q.   What is the basis for your reason to believe that?

14    A.   Oh, because he was given court orders before.

15             (Audio played)

16    Q.   Who is the person that said, "You know that what it is,

17    right?"

18    A.   That is Mr. Usman Doria.

19    Q.   Usman Doria.   Is Usman Doria here today?

20    A.   Yes, he's here today.

21    Q.   Can you point him out to me?

22    A.   There's a man all at the back, number two in the row.

23    Q.   Is Mr. Mike here also?

24    A.   He is also here.

25    Q.   Can you point him out to me?

1   A.  Mr. Mike is behind the attorney.

2   Q.  Mr. Mike raised his hand and I saw who he was, so thank

3   you.

4   A.  You're welcome.

5        (Audio played)

6   Q.  Do you know who the attorney who he's referring to was?

7   A.  I don't know who he was referring to, but he said the same

8   attorney who is representing us.

9   Q.  Representing you and the criminals?

10  A.  Yes, that's what he said.

11       (Audio played)

12  Q.  Did he say he had a hearing tomorrow?

13  A.  He said he has to go to a hearing tomorrow.

14  Q.  And he needs your help?

15  A.  And he needs my help.

16       (Audio played)

17  Q.  Was Mr. Memon asking you to lie?

18  A.  He was asking me to write a false document as if I said so,

19  which was not correct, because he was telling me that the

20  following day his attorney had a court hearing.

21  Q.  And is he talking about what's on that document?

22  A.  Yes, he did.

23  Q.  And did he show you a document?

24  A.  He showed me the document.

25       MR. MARLBOROUGH:  I'd like to have this marked,

1    please, as Plaintiff's 2.  Do you need one for the Court?

2              I'd like to show the witness the document?

3              THE COURT:  Sure.

4    BY MR. MARLBOROUGH:

5    Q.  Have you seen this document before?

6    A.  Yes, I saw this document before.

7    Q.  What is this document?

8    A.  This document was presented to me by Mr. Mike Memon so that

9    I can put my name here to certify that I am not involved in

10   this lawsuit, and my identification was theft and misused, my

11   information, therefore, I didn't sign any paperwork.  The

12   statement is prepared by myself voluntarily without any pursuit

13   or obligation.  Yours sincerely, so and so.  He even told me I

14   can put another more paper to support this.

15   Q.  Did you just read that full document out to me verbatim?

16             THE COURT:  Just a second.  Not until it's in

17   evidence.  Do you want to introduce it?

18   Q.  Is this an accurate copy of a document that you saw?

19   A.  This is 100 percent of a copy.

20   Q.  Is it a photographic copy?

21   A.  This was the paper, and I made a copy of it with my phone.

22   Q.  So you personally made the copy with the phone?

23   A.  Yes, because it was presented to me.

24   Q.  And what did you do with the copy?

25   A.  I sent it to the attorney so that they can see it.

```
 1   Q.  To me?

 2   A.  Yes.

 3   Q.  It looks like the document looked on the day that you took

 4   the picture?

 5   A.  Yes.

 6            MR. MARLBOROUGH:  Your Honor, I'd like to move this

 7   into evidence.

 8            THE COURT:  As?

 9            MR. MARLBOROUGH:  As Plaintiff's Exhibit 2.

10            THE COURT:  It's admitted.

11   Q.  And this is the document that Mr. Mike is referring to on

12   the audio?

13   A.  That's correct.

14   Q.  Just to back up a little bit.  Mr. Mike is referred -- is

15   he often referred to -- Michael Memon, is he often referred to

16   as Mr. Mike?

17   A.  Mr. Mike Memon gave me this paper to sign.

18   Q.  And Gulan Doria, does he have a nickname?

19   A.  With this paper?

20   Q.  No.  I was just asking in general, does Gulan Doria have a

21   nickname.  Do people call him something in the store?

22   A.  They call him Mr. G.

23   Q.  And Mohamed Doria, did he have a name that people called

24   him?

25   A.  Mr. Mohamed.
```

```
 1              (Audio played)
 2   Q.  Can you tell me what was the reference to deducting the
 3   taxes?
 4   A.  Excuse me?
 5   Q.  Was there a reference to deducting from taxes?
 6   A.  Yes, that's what he says.  He say he cannot -- he is going
 7   to deduct my taxes if I sign this paper.
 8   Q.  If you do sign the paper --
 9   A.  Yeah.  Can you play it again, please, the last part?
10   Q.  Yeah, sure.
11              (Audio played)
12   Q.  What were the conditions that you're referring to?
13   A.  To pay at least minimum wage.  Those are the better
14   conditions.  And if I work more than that, I have to get
15   something, like overtime.
16   Q.  How many hours of work a week were you working?
17   A.  I was working 66 hours, and then they cut me to 60 hours.
18   Now they cut it again to 30 hours.  Last week I went 23 hours.
19   Q.  Did you ever get paid overtime?
20   A.  Never.
21   Q.  Did you ever get paid minimum wage before last week?
22   A.  For the first time last Saturday in ten years.
23   Q.  I'm sorry.  Did you say Chinese?
24   A.  In ten years.
25   Q.  In ten years.
```

 1   A.   Yes.

 2   Q.   If he were to improve the conditions, that would mean he'd

 3   be out of business if he paid you minimum wage?  Is that your

 4   interpretation?

 5   A.   That is what he said.

 6   Q.   And he'd be out of business if he paid you overtime?  Is

 7   that what he said?

 8   A.   That is what he said.

 9            (Audio played)

10   Q.   Did you hear him state the number of employees?

11   A.   Yes.

12   Q.   How many employees did he say he had?

13   A.   He has hundred employees.

14            (Audio played)

15   Q.   Who is that that said, "Stabbing in the back us?"

16   A.   That was Mr. Usman Doria.

17            (Audio played)

18   Q.   Is Usman Doria a stock boy?

19   A.   No, he's the manager.

20            (Audio played)

21   Q.   Did he say you go from store to store?

22   A.   Yes.

23   Q.   Is that part of your job responsibilities?

24   A.   That's part -- yes, I go to store -- that time I was going

25   from store to store to make orders for all the stores.

1  Q.  Do you still do that?

2  A.  No, I don't do that.

3  Q.  Why not?

4  A.  They have promoted me and they cut my hours.

5  Q.  Are you a person who knows a lot of people who work at the

6  discount stores?

7  A.  I'm knowing every person working in discount stores.

8  Q.  More so than most of the other workers, or the same?

9  A.  Most of them are the same workers.

10 Q.  No, no.  Do you know more about who works at the stores

11 than the average worker?

12 A.  Yes.  I know each and every person per store.

13 Q.  Is that because you go from store to store doing your job?

14 A.  Before I go from store to store, so I meet those people all

15 the time.

16          (Audio played)

17 Q.  Is this a reference again to two criminals --

18 A.  Yes.

19 Q.  -- who ran away?

20 A.  That's what he said.

21 Q.  Do you know what that's in reference to?

22 A.  No.

23 Q.  Does it have anything to do with whether or not you deserve

24 to be paid minimum wage and overtime?

25 A.  No.

```
 1               (Audio played)

 2   Q.  Was there a reference to an arrest?

 3   A.  Which one?

 4   Q.  Did you hear a reference to an arrest?

 5   A.  Oh.  Can you play that part again?

 6   Q.  I can.

 7               (Audio played)

 8   Q.  That was the portion I was talking about.  Did you hear

 9   anything about an arrest on that?  We can move on.

10   A.  Yeah.  Okay.  You can play it for the last time.

11   Q.  Okay.

12               (Audio played)

13   Q.  I'm just going to ask you the same question about, did you

14   hear a reference to an arrest?

15   A.  Yes, yes.

16   Q.  The person would be -- did he say when that person would be

17   arrested?

18   A.  He said he took 9,000 from him.

19   Q.  Okay.

20   A.  Yes.

21   Q.  Do you know what that's in reference to?

22   A.  No.

23               (Audio played)

24   Q.  Is that true?  Do you know more information about anyone in

25   the store?
```

1   A.  According to Mr. Mike, yes.

2   Q.  Among the work nonmanagement personnel?

3   A.  Oh, can you ask --

4   Q.  Do you have a lot of knowledge about the stores?

5   A.  Yes, I do.

6   Q.  Among nonmanagement?

7   A.  Yes.

8   Q.  You're not an owner of the store.

9   A.  Yes.

10  Q.  You're not a manager of the individual store.

11  A.  Yes.

12  Q.  But for the average worker, you know more than the average

13  worker about the business.

14  A.  Yes.

15              MR. CHONG:  Objection.

16              THE WITNESS:  100 percent.

17              (Audio played)

18  Q.  Is that a new voice on the tape?

19  A.  A new?

20  Q.  Can you tell me who Mr. Mike is talking to right there?

21  I'm going play it again.

22              (Audio played)

23  Q.  Is there a different voice on the tape?

24  A.  That is a different voice from Maddi Nasoco.

25  Q.  Was he present during the whole meeting?

 1   A.  Yeah, he was present in the meeting.

 2   Q.  Who is Maddi Nasoco?

 3   A.  He is a plaintiff in the case, and is still working.

 4          (Audio played)

 5   Q.  What is Mr. Nasoco saying at that point?

 6   A.  Yeah.  Mr. Nasoco say he don't want to sign anything.

 7   Q.  So if he did subsequently sign something, it would be

 8   inconsistent with what he just said here?

 9   A.  Yes.

10          (Audio played)

11   Q.  Can you tell me what that's in reference to, putting

12   everyone in the book?

13   A.  He say his attorney said so to put everybody in the book.

14   Q.  What does putting everyone in the book mean?

15   A.  Start to put everybody -- what do you call -- start to

16   record everybody's name and everything; time, taxes, and all

17   those kind of stuff.

18   Q.  Have they done that?

19   A.  Not yet.

20   Q.  Not yet?  And when was this tape from?  May?

21   A.  Which one?

22   Q.  This tape is from May?

23   A.  Yeah, that was the day before the hearing.

24          (Audio played)

25   Q.  Do you have reason to believe that Mr. Memon pays payroll

 1  taxes for you for your employment?

 2  A.  No.

 3  Q.  Did he just say he pays taxes?

 4  A.  That's what he say.

 5  Q.  Does he make contributions to your social security?

 6  A.  No.

 7          (Audio played)

 8  Q.  Does he pay unemployment insurance?

 9  A.  No.

10  Q.  Does he pay worker's comp insurance?

11  A.  No.

12  Q.  What happens if someone's injured on the job?

13  A.  They don't owe you.

14  Q.  Have you ever seen an incident where that occurred?

15  A.  Yes.  I have seen one time.  Once they hired a Puerto Rican

16  guy.  He collapsed in the corner.

17          MR. CHONG:  Your Honor, I'm going to object to this

18  line of questioning.

19          THE COURT:  Sustained.

20          (Audio played)

21  Q.  Is that Usman Doria also asking about your lawyers?

22  A.  Yes.

23  Q.  Do you have reason to believe that Usman Doria knew about

24  the order not to talk about lawyers?

25  A.  Oh, all of them they knew.

1   Q.  How do you know that Usman Doria knew?

2   A.  Because --

3              MR. CHONG:  Objection, your Honor.  It's asking the

4   witness to testify about somebody else's knowledge.

5              THE COURT:  Sustained.

6   BY MR. MARLBOROUGH:

7   Q.  What reason do you believe to have?  Has he said anything

8   about the order?

9   A.  No.  Because the orders were laid against them before he

10  knew it.  Since May 12, the judge gave them the orders.

11  May 12th.

12             (Audio played)

13  Q.  Did he say there was more merchandise at a certain time?

14  A.  Yes.

15  Q.  What time was that?  Can I play it again?

16  A.  Yes.

17             MR. CHONG:  Your Honor, I'm going to object to the

18  replaying --

19             THE COURT:  That is sustained.

20             MR. CHONG:  And the leading questions.

21             THE COURT:  Sustained.

22             (Audio played)

23             MR. CHONG:  You're not -- he just ruled on that,

24  you're not able to play that back.

25             (Audio played)

1          MR. CHONG:  Excuse me, Chris.

2          MR. MARLBOROUGH:  We're not playing it back.

3          MR. CHONG:  You need to stop that.

4          MR. MARLBOROUGH:  We're not replaying anything, we're

5   continuing the tape.

6          MR. CHONG:  Okay.  Go ahead.

7          (Audio played)

8   Q.  Can you tell me what was just said there?

9   A.  Yeah.  Mr. Mohamed used to buy, but not like before.

10  Q.  And Mohamed was manager of the business?

11  A.  Yeah.  That was the big boss.  Not the manager, big boss.

12  Q.  What sort of things did he handle?

13  A.  Which one?

14  Q.  What did Mr. Mohamed handle?

15  A.  He was making the orders, and each and every Saturday I was

16  going through the inventory to give it to him.  That was one of

17  the jobs which I have to do.  Because I am the one who was

18  going to the stores -- I don't know when the start days -- what

19  is needed and what is not needed.

20  Q.  What about workers' pay?

21  A.  All of them, they know what workers' paid.

22  Q.  Mohamed was involved in that?

23  A.  That is the boss.

24          (Audio played)

25  Q.  Did you hear that last sentence?

1    A.  Yes.

2    Q.  What did he say?

3    A.  He was reading this paper.  He say the statement was not

4    prepared by myself voluntarily without any pressure or

5    obligation.

6    Q.  Was that true?

7    A.  That was false.

8            (Audio played)

9    Q.  What happened after that conversation?

10   A.  After that conversation, I walked in the middle of the

11   store, and Mr. Usman Doria called me, he say, I have to know

12   the consistencies of not signing this paper.  I'm going to get

13   fired after this case is closed.

14           MR. CHONG:  Objection, your Honor.

15           THE COURT:  Overruled.

16   BY MR. MARLBOROUGH:

17   Q.  Did the hearing take place that was referenced in the --

18   A.  No, it was postponed.

19   Q.  Did you continue to work at the store after the hearing?

20   A.  I continue to work in the stores, but they cut my time more

21   and more.

22   Q.  Did you get suspended at any point in time?

23           THE COURT:  I'm sorry?

24   BY MR. MARLBOROUGH:

25   Q.  Did you get suspended at any point in time?

 1   A.  Yes.  I was suspended after the Memorial Day.  I came to --

 2   they told me -- Mr. G told me to come at 12:00.  And when I got

 3   there, he made me stand for two hours.  After that, he told me

 4   to go.  From there, they start to cut my time, time, time all

 5   the time.

 6   Q.  At that time, prior to this conversation, how many hours a

 7   week were you working?

 8   A.  That time I was working 60 hours.

 9   Q.  Up until late July, July 25th, how many hours were you

10   working at that --

11   A.  I was -- they cut my time to 30 hours, sometimes to 22.

12   Like last weekend I worked 23 hours.

13   Q.  Was there another court hearing after this?

14   A.  Which one?

15   Q.  You said the court hearing was postponed?

16   A.  Yes.

17   Q.  Was there another court hearing?

18   A.  Yeah.  There was another court hearing which was in Foley.

19   40 Foley Street.

20   Q.  And you attend that hearing?

21   A.  Yes, I attend that hearing.

22   Q.  Were you called to the witness stand, as you are now?

23   A.  Yes.

24   Q.  Did you sit down in the witness box?

25   A.  Yes.

```
 1   Q.  Did you testify about the case?

 2   A.  That time I just took the stand, I was not asked questions.

 3   Q.  Do you know what rulings came out of that hearing?

 4   A.  Excuse me?

 5   Q.  What the judge did at that hearing?

 6           MR. CHONG:  Objection, your Honor.

 7           THE COURT:  Sustained.

 8           THE WITNESS:  Yes.

 9           MR. CHONG:  Legal conclusions.

10           THE WITNESS:  Yeah.  The judge wanted them to calm the

11   situation down, which they never did even after the hearing.

12   Everything continued as usual.

13           MR. CHONG:  Your Honor.

14           THE COURT:  I'll let it stand.

15   BY MR. MARLBOROUGH:

16   Q.  Did management ever talk to you about your testimony?

17   A.  There was the other day when I was talking to Mike,

18   suddenly I was called Mike.  We were in the --

19   Q.  Michael is a coworker?

20   A.  Is a coworker, yes.

21   Q.  Is Michael is not a manager?

22   A.  No, no.  I was working with Michael, and Michael was asking

23   me -- I was telling Michael that I want to try to do as fast as

24   possible because I'm leaving at 5:00.  Michael ask me, "When

25   are you leaving at 5:00?"  I told him Michael that I was not
```

 1   supposed to leave at 5:00, but they cut my hours.  He asked me,

 2   "Who cut your hours?"  I said, "The management cut my hours,

 3   and the judge told them not to cut nobody's hours until the

 4   case is finished."

 5          So Usman came from behind and told me that I took

 6   advantage of the tape, which I submitted to the Court.  That

 7   was in the third floor of Bergen Discount Store.

 8   Q.  Do you know who Daniel Rodriguez is?

 9   A.  I known Daniel Rodriguez.

10   Q.  Were you present on Daniel Rodriguez's last day of

11   employment?

12   A.  Yes, I was present.

13   Q.  Was Daniel Rodriguez an employee of the discount stores?

14   A.  Yeah, he was an employee.

15   Q.  Is he no longer an employee?

16   A.  Yeah.  He was fired.

17   Q.  Were you present on the day that he was fired?

18   A.  I was present when -- that day.

19   Q.  Can you tell me what happened on that day?

20   A.  Mr. Usman Doria say Daniel Rodriguez pulled a knife on him.

21   So Mr. Usman Doria came outside, and he told me he know I

22   cannot tell his lawyer and I cannot be in his side.

23          I told him that if I saw what happened, I was going to

24   be in your side, because that's a weapon.

25          Then they called the police.  The police came, they

 1   come, they do their thing, and they say -- they search, they

 2   ask the guy the questions, and the police told them that

 3   there's no proof.

 4         Same date, Mr. Usman Doria went to the prison with

 5   Jose Ramos to try to press charge, and then they told them that

 6   the evidence is not enough.

 7         And Mr. Mike Memon, in that afternoon, he came, he

 8   pose with the police, he asking this --

 9   Q.   I'm sorry.  What?  He came and did what?

10   A.   He came and posed with the police to take the pictures.

11   Q.   Posed with the police?

12   A.   Yeah.  He say -- and he was saying, "This case is done."

13   Q.   You personally witnessed this?

14   A.   I saw that.  I was not only by myself, even one of the

15   gentleman, Kofei, was there.

16   Q.   Who is that person that was there?

17   A.   Joseph Kofei was one of the guys who were there, who they

18   call Usman, too.

19   Q.   And you heard the statement?

20   A.   Which one?

21   Q.   You heard the statement that Mr. Mike made personally?

22   A.   No.

23   Q.   You said he made a statement about the lawsuit?

24   A.   He said what?

25   Q.   You said he posed with police.

1  A.  Yes.  He was posed with the police, and he said in his own

2  ways, he said, "This case is done."  He wanted -- they wanted

3  them to take the pictures of that incident so that they can go

4  do --

5  Q.  You personally heard him say that?

6  A.  I personally heard him saying that, because I was with them

7  outside when it happened.

8  Q.  Do you know who Christopher Bruce is?

9  A.  I know Christopher Bruce.

10  Q.  How do you know Christopher Bruce?

11  A.  Christopher Bruce, we work together in Buy & Saves.  And

12  they moved him to 3rd Avenue.  They mostly call him Jerry.

13  That was the most popular name.

14  Q.  Did Chris Bruce tell you what he planned to do in

15  connection with this lawsuit?

16          MR. CHONG:  Objection, your Honor.

17          THE COURT:  Sustained.

18          MR. MARLBOROUGH:  Your Honor, I think it's state of

19  mind evidence, if it's objection on hearsay grounds.  Is it

20  still sustained?

21          THE COURT:  Next question.

22          MR. MARLBOROUGH:  Okay.

23  Q.  Do you know whether Christopher Bruce was subject to

24  similar interrogations that you were subject to?

25  A.  Yes, I know.

```
 1              MR. CHONG:  Objection, your Honor.

 2              THE COURT:  Overruled.

 3   Q.  Have you ever seen a document --

 4   A.  Yes, I did.

 5   Q.  -- signed by Christopher Bruce --

 6   A.  Yes, I did.

 7   Q.  -- concerning this lawsuit?

 8   A.  Yes, I did.

 9   Q.  What was that document?

10   A.  The document was issued to Christopher Bruce by Mr. G to

11   withdraw from the thing.  Because Christopher Bruce is a sick

12   guy.  He has got a open -- he had an open heart surgery before,

13   so he cannot take pressure.  Pressure, pressure, pressure.  And

14   he was even told, he was even from this day, good Christmas

15   bonus if he withdraw.  They put him, they pressurized him until

16   he withdraw.

17   Q.  And did he withdraw?

18   A.  Yes, he did.

19   Q.  How do you know that?

20   A.  He told me.

21              MR. MARLBOROUGH:  I'd like to mark this exhibit.  May

22   I give a copy to the witness?

23              THE COURT:  Sure.

24   BY MR. MARLBOROUGH:

25   Q.  Have you seen this document before?
```

1    A.   Yes, I saw this document before.

2    Q.   What's the name -- the FROM on the document?

3    A.   Christopher -- it was coming from Christopher M. Bruce to

4    Mr. Mike.

5    Q.   Is that document notarized?

6    A.   It is notarized in the bottom.

7    Q.   How did you first see this document?

8    A.   A colleague of mine who was handed this paper, too, because

9    he didn't want to withdraw.  They told him to write the same

10   letter with his own writing and give it to Mr. G.

11   Q.   Do you know when that occurred?

12   A.   That was like last week Thursday -- Wednesday -- that was

13   last week.  This happened last week.

14           MR. MARLBOROUGH:  Your Honor, we'd like to move for

15   admission as a self-authenticating document because the

16   document is notarized --

17           MR. CHONG:  Objection, your Honor.

18           MR. MARLBOROUGH:  -- based on the foundation

19   established.

20           THE COURT:  Sustained.

21           MR. CHONG:  Thank you.

22   Q.   Are you aware of other workers who have had their hours

23   cut?

24   A.   Yes.  I know some of the -- yeah.  Only the plaintiffs.

25   Q.   Can you tell me the names of some of the people who had

1   their hours cut between May 12th and July --

2   A.   Okay.

3   Q.   -- 25th when Daniel Rodriguez --

4   A.   One of them was Daniel Rodriguez.  They cut his time before

5   they fire him.  And Joseph Kofei, Sergio Recinos, myself

6   included.  There was another guy, Ronald Agyemang.

7          Some of the guys, they were supposed to cut their time

8   also, and they were told to sign this paper and submit it to

9   Mr. G so that their time can be restored to 66 hours.

10         So those, they never cut their hours, but there was --

11  they give them this paper to withdraw.  If they don't want

12  to -- if they sign, they will work 66 hours.  If they don't

13  sign, they will have to have a 25-hour schedule per week.

14  Q.   Workers who did not join the lawsuit, were they subject to

15  similar cuts in their hours?

16  A.   No.   They work 66 hours.

17         MR. CHONG:  Objection, your Honor.  How is he going to

18  testify about other workers?

19         THE COURT:  Overruled.

20  Q.   And workers who signed the papers didn't have their hours

21  cut?

22  A.   Excuse me?

23  Q.   Workers who signed the statement saying they didn't want to

24  be part of the lawsuit, they did not have their hours cut?

25  A.   No.

1    Q.  Even if they were plaintiffs in the case?

2    A.  Those who signed the lawsuit, they cut their hours, right?

3    They are the people who they never cut their hours, those who

4    are not part of the lawsuit at all, they were still working 66

5    hours.

6    Q.  Do you know of any other plaintiffs who signed the paper?

7    A.  Yeah, I know a lot of plaintiffs who signed the paper, yes.

8    Q.  Can you name them?

9    A.  There's Alioune.  They cut him time last week.  I even

10   forgot.

11   Q.  The paper that we were talking about earlier about -- to

12   discontinue the case.

13   A.  To discontinue the case?

14   Q.  Yes.  You said that people were pressured, the man who had

15   a lot of problems with his heart.

16   A.  Yeah.  That's the one who --

17   Q.  Who signed that paper?

18   A.  -- who signed that paper because he couldn't take the

19   pressure.  Yeah.  He's high blood, and his heart situation, he

20   cannot go on and go.

21           MR. CHONG:  Objection.  He's testifying about some

22   third party --

23           THE COURT:  Sustained.

24           THE WITNESS:  Excuse me?

25           THE COURT:  No question.

1           MR. MARLBOROUGH:  I can't ask you that.

2    BY MR. MARLBOROUGH:

3    Q.  Is there any other way that plaintiffs in the lawsuit are

4    treated differently than other workers?

5    A.  Yes.  The plaintiffs on the lawsuit, they cut their time,

6    and they are always give them hard time, pressure, pressure.

7           MR. CHONG:  Objection, your Honor.  He's testifying

8    about other people other than himself.

9           THE COURT:  Yes.  I understand.  I'll let it stand.

10          THE WITNESS:  Pressure, pressure, pressure, and they

11   be exploited.  So some of the people who are willing to join

12   the case cannot join by seeing their colleagues being

13   exploited.

14   Q.  Have defendants sought your immigration documents?

15   A.  That have ask me.  Maddi Nasoco who ask me.  Mr. Mike Memon

16   asked Mr. Maddi to ask me.

17   Q.  What purpose would they have for seeking your immigration

18   documents?

19   A.  So that they can try to block me from being part of the

20   case.

21          MR. CHONG:  Objection, your Honor.

22          THE COURT:  Overruled.

23   Q.  Do you believe that the hour cuts are a result of a

24   business slowdown?

25   A.  No.  The business is booming.  You can go, every day we

 1   have big deliveries.  If you go through the camera, you can see

 2   load, load, load is in every day.

 3   Q.  Do you know if any workers have been hired since the

 4   plaintiffs had their hours cut?

 5   A.  Yeah.  They hire a lot of guys.  There is another guy

 6   called George, there's another African lady, and a Bangladesh

 7   lady, there's another lady who is promoted and there's another

 8   guy in the neighborhood.

 9   Q.  How many hours are those people --

10   A.  They work 66 hours.

11            MR. MARLBOROUGH:  No further questions, your Honor.

12            MR. CHONG:  Your Honor, just a few questions here.

13                         CROSS EXAMINATION

14   BY MR. CHONG:

15   Q.  Mr. Tebogo.

16   A.  Yes.

17   Q.  You testified earlier that you knew about the court order.

18   What court order are you referring to?

19   A.  The one which was given to the defendants on the May 12th.

20   They know it, too, the same one.

21   Q.  Who told you about that order?

22   A.  Who told me about the -- because I was -- I was complaining

23   to the attorneys that the bosses are retaliating and giving us

24   pressures.

25            MR. MARLBOROUGH:  I'm going ask you not to discuss any

 1    contents of your communications with your attorneys.

 2             THE WITNESS:  Okay.

 3    BY MR. CHONG:

 4    Q.  So who gave you the order?

 5    A.  The orders were coming from the judge.

 6    Q.  The judge gave you a copy of the order?

 7    A.  They gave it to the defendants, the defendants who they've

 8    avoided that.  So because they just do their own thing, that

 9    all.

10    Q.  So if you knew about that order, why did you --

11    A.  Those orders were not given to me, even if I not got them.

12    They were given to somebody to follow, not me to follow.

13    Q.  Okay.

14    A.  So whoever had the orders, he know what he was supposed to

15    do.  I don't have nothing to do with the orders.

16             What I had to do was to only do my job.  Whatever they

17    tell me to do, that is what I was supposed to do.  The orders

18    were not my orders.

19    Q.  Nobody gave you the order, but you knew about the order; is

20    that right?

21    A.  Yes.  And they know the order too.

22    Q.  Well, if you knew about this order, which said the

23    defendants are not supposed to speak to you and you're not --

24    there's supposed to be no discussion about the lawsuit, why did

25    you walk into their office with a tape recorder in your pocket

 1   and try to record them and discuss the lawsuit?  What was your

 2   intent?

 3   A.  For my security reasons, because I don't know what -- if

 4   you record, is even better because you can take that

 5   information and put it to the -- like here.  Nobody can deny

 6   it.  But if I just write, write, write without any audio,

 7   somebody can say he's a liar.

 8   Q.  How do we know that this recording that you sent to your

 9   attorney, and this transcript, which I deem inaccurate, is a

10   complete recording of the discussion that you had with my

11   clients?

12   A.  The recording, which I did, was one which you just hear.

13   Q.  How do we know you didn't cut off the first part and the

14   last part?

15   A.  I can only follow what you are -- whatever we just hear in

16   the audio that's what I can follow.  The writing which somebody

17   put, I cannot hundred percent follow.  But I can only tell

18   about the voices, my voice and other people's voices.

19   Q.  I'm going to show you what's been marked as Plaintiff's

20   Exhibit 2.

21            MR. CHONG:  May approach, your Honor?

22   Q.  You recognize this document?

23   A.  Yes.

24   Q.  Okay.

25   A.  This was given to me by Mr. Mike.  He handed it to me.

1  Q.  When did he hand that to you?

2  A.  A day before the court hearing.

3  Q.  The day before the court hearing?

4  A.  Yes.

5  Q.  So what did you do with the original document?  Where is

6  it?

7  A.  The original document, I think I have it in my house.

8  Q.  Why didn't you give it to your attorney?  Did you know that

9  there are discovery requests made in this case, and I've

10  requested all documents in relation to this matter?

11  A.  It's the same thing.

12         MR. MARLBOROUGH:  Objection.

13         THE WITNESS:  This is the same thing.

14  BY MR. CHONG:

15  Q.  This is the same thing?

16  A.  Yes.

17  Q.  Whose handwriting is this?

18  A.  That was -- I cannot tell whose handwriting this is, but I

19  was given the letter this one by Mr. Mike.  It's just like he

20  say in the audio, that tape, this one.  So you can ask him that

21  question, he can answer you.

22  Q.  You testified earlier that your hours were reduced.

23  A.  Yes.

24  Q.  If you're contending that the defendants are retaliating

25  against you, why wouldn't they just fire you?

1   A.  Is up to them to fire me.

2   Q.  Wouldn't it be fair to say that, instead of firing you,

3   they just reduced your hours.  They kept you -- they kept your

4   employment, you kept your job, right?

5   A.  They kept -- I kept my job and they hired people.

6   Q.  Who did they hire?

7   A.  They hired a lot of people.  They hired another lady, they

8   hired -- in less than two weeks they hired about five people.

9   Q.  How do you know they hired five people?

10  A.  We know each other.  I can go around.  I still have friends

11  within this company because I used to go around.  I have

12  friends.

13  Q.  So which location did they hire these other people at?

14  A.  They have George and Willis, they have an African lady and

15  a Bangladesh lady.  Mr. G last week he took Adell to Morris.

16  There's another guy in the neighborhood.  If you go there right

17  now, you are going to find those people.

18  Q.  Do you know if those are full-time people or part-time

19  people?

20  A.  I find those people.  Sometimes I come myself to see if

21  these people -- I can come there and see if these people spend

22  the day there.  These people are working full time.

23  Q.  So you're saying all those people are full time.

24  A.  They are working full time.  But just like they will tell

25  you -- they will never tell you the truth.  They work full

 1   time.  They can give you their own time.

 2   Q.  Who will not tell the truth?

 3   A.  Huh?

 4   Q.  Strike that.

 5   A.  Okay.

 6   Q.  Did you know that the defendants were having difficulty

 7   with their business?

 8   A.  What kind of difficulties, sir?

 9   Q.  Did you know that their business was slowing down?

10   A.  If the business is slowing down, you cannot have big, big

11   shipments every day.

12   Q.  Why is that?

13   A.  Ship, ship, shipments.  You don't know the stuff coming to

14   the stores every day to be distributed amongst their stores?

15   Q.  You testified earlier that you said you were suspended.

16   What do you mean you were suspended?

17   A.  To be suspended.

18   Q.  Okay.  How were you suspended?  What happened?

19   A.  I came to work.  Mr. G told me to stay there that day.

20   That was after -- that was Memorial Day.  Then he gave me about

21   a day to come.  After that he start to cut my time.  That time

22   I was not working on my regular schedule.  They suspended my

23   time after that and decided to give me a new schedule that from

24   now and onwards you have to be working like this.

25   Q.  Is it possible that they've reduced your hours because

1   there's a reduction in their business?

2   A.  No.

3   Q.  It's not possible?

4   A.  It's not possible.  But it is possible -- that cannot --

5            THE COURT:  There's no question pending.

6            THE WITNESS:  All right.  Sorry.

7   BY MR. CHONG:

8   Q.  You testified about Daniel Rodriguez and a knife incident

9   at the store.

10  A.  Yes.

11  Q.  Which store was that?

12  A.  That was Bergen Discount.

13  Q.  That's the main store?

14  A.  That's the main store, yes.

15  Q.  You were working at that main store.

16  A.  I was working that store, was working there.

17  Q.  Did you go to the police station with the defendants to

18  file the report?

19  A.  Jose Ramos went with Usman Doria.  And he say -- he talk to

20  me and he talk to other guys that they went there.  So they

21  talk.  You know, everybody get along with each other, so it's

22  not a secret that they went to the police.

23  Q.  You testified earlier that you knew what the police said to

24  them.

25  A.  That was whatever Jose told us, not only me.

 1   Q.  Who told you that?

 2   A.  Jose Ramos.  He was saying they went to the police.  He was

 3   talking to me and other guys.  It's not a secret.

 4   Q.  Who's Jose Ramos?

 5   A.  He's a worker.  It was not a secret.

 6   Q.  So Jose Ramos went to the police station with the

 7   defendants?

 8   A.  Yes, sir.

 9   Q.  Then he came back and he told you what happened?

10   A.  He was talking to everybody, not only me.  Because

11   everybody in the store is a friend.  We spend 11 hours together

12   so -- that's where we spend most of our time.

13   Q.  You testified about someone named Chris Bruce, and

14   sometimes you call him Jerry.

15   A.  Yes.

16   Q.  You worked at the same stores with him, right?

17   A.  I work with him, yes.

18   Q.  Why did Chris Bruce decide to withdraw from this lawsuit?

19   What's your explanation for that?

20   A.  Because Christopher Bruce was pressured.  They have gave

21   him too much pressure.

22   Q.  How do you know that?

23   A.  That's what he told me.  He talked to me.

24   Q.  What kind of pressure did they give him?

25   A.  They force him to do it, just like they did -- just like --

1    you've been hearing on audio telling me to do it.  He was

2    ordered to do it.

3    Q.  He was ordered to do it?

4    A.  Yes, he was ordered to do it.

5    Q.  By who?

6    A.  If he want to do it.  If you don't want to do it, we cut

7    your hours from tomorrow.  Take it or leave it.

8    Q.  Who ordered him?

9    A.  Mr. G ordered him.  It's not only Mr. G.  Before Mr. G go

10   to the store, Siraj went there with Usman.  And the guy told me

11   that he went there to tell him to withdraw from the lawsuit.

12   Q.  How do you know about this document?

13   A.  It's coming from the coworkers who were given the same

14   document so that their time cannot be cut.

15   Q.  Which coworker did you get this from?

16   A.  It was -- three of them actually showed it to me.

17   Q.  Who?

18   A.  Three of them.

19   Q.  Oh, yeah, but what are their names?

20   A.  I give you the names, but at the end of the day, they are

21   going to retaliate against them at work.

22   Q.  Alls you have to do is tell me their names.

23   A.  Okay.  Mady Nassoko has the paper, Auguste have the paper,

24   and Wilson Tenuda has the paper.

25   Q.  Why would Christopher Bruce give this letter to these three

1   people?

2   A.   Because they were supposed to have the same letter, but put

3   in the addresses and their names with their own handwriting.

4   Q.   How do you know they were supposed to write the same

5   letter?

6   A.   That's what they were told, to write the same letter with

7   their own writing.  Just put it your name, and submit it to the

8   thing, and it is going to be submitted to the court.  That's

9   what they were told.

10  Q.   You mentioned something about somebody getting arrested in

11  this supposed recording.  Who were you talking about?

12  A.   I didn't talk about somebody getting arrested.

13  Q.   What about two criminals?  You testified that there was

14  some testimony about two criminals in this.

15  A.   That was Mike's -- that was Mike's words.  That you can

16  refer to Mike.  He can answer it.

17  Q.   What was that discussion about?  You were there.

18  A.   Me, the discussion was about withdrawing.  That's why they

19  were calling me.  They were calling me to withdraw, to sign the

20  paper, that's why they were calling me.  That was the main

21  theme for the meeting.  The meeting was for me to sign the

22  false document and submit it.

23  Q.   If you didn't want to withdraw, why didn't you just walk

24  out of that office?  Why did you stay there for 20 minutes?

25  A.   I cannot walk away from my bosses.  What if they fire me

1   for walking away from them?

2   Q.  Are you still working at Bergen?

3   A.  I still work at Bergen Discount.

4   Q.  You say you were demoted.  What was the position that you

5   held that you were demoted from?

6   A.  I was making orders from store to store.

7   Q.  What was your title?

8   A.  Like a sales -- like a salesman for the company.

9   Q.  Did the company give you that title, salesman?

10  A.  I was just doing like a salesman.  I'm just giving you the

11  thing.  My job was to make orders for all the stores.

12  Q.  That was your title, salesman?

13  A.  I don't know how you call it, but that's why they gave it

14  to me.  They told me to go from store to store to make the

15  order from the main account, because they have a big warehouse

16  and selling to other stores.  I was just doing like a salesman.

17  I'm just giving you an example.

18  Q.  What did your position change to?

19  A.  Now I'm -- now I don't have no position.  Whatever I have

20  to do is only to push the hand truck to take deliveries.

21  That's it.

22  Q.  Is it your testimony that Maddi Nasoco was also in the room

23  during this alleged conversation?

24  A.  Yes, he was there.

25  Q.  Why was he there?

```
 1   A.  Why was he there?  Because him and me were called together,

 2   same time.

 3   Q.  Is Maddi Nasoco still working for the company?

 4   A.  He was there.

 5   Q.  Did Maddi Nasoco know you were supposedly recording this

 6   conversation?

 7   A.  Do Maddi knew what?

 8   Q.  Did Maddi Nasoco -- did he know that you were recording

 9   this conversation?

10   A.  I don't think so.

11   Q.  You didn't tell him.

12          Do you still have the phone with this recording on it,

13   this recording that your attorneys played back in court today?

14   A.  Yes.  I don't have it here, but I have it, yes.  I left it

15   there.  Same phone.

16   Q.  And the recording is still on it, so you can provide that

17   to your --

18   A.  100 percent, you're going to get the same thing.

19   Q.  You can provide that to your attorney?

20   A.  Nothing -- I can give it to him anytime.

21   Q.  You said you emailed that to Mr. Marlborough, correct?

22   A.  Yes.

23   Q.  What's your email?

24   A.  My email is keletsotabogo@aol.com.

25   Q.  Did you email that the evening before that hearing the next
```

1    day?

2    A.  I emailed it before -- in less than an hour after I

3    listened to it, I got it, listened to it, and I emailed it

4    right away, not a day before.

5    Q.  When did you send this document, this Plaintiff's

6    Exhibit 2, to your attorney?

7    A.  Same time.

8    Q.  Same time?

9    A.  Yes.

10   Q.  So they're both attached to the email?

11   A.  Yes.

12   Q.  Do you still have that email within your emails?  Do you

13   think you can get a copy of that email?

14   A.  I still -- I believe I can get this because I don't think I

15   deleted it.

16   Q.  What time of day was it when you had these conversations,

17   these recorded conversations?

18   A.  Which one?

19   Q.  What time of day was it when you had these recorded

20   conversations?  Was it morning, afternoon?

21   A.  It was --

22            THE COURT:  That's enough.  What time was it?  What

23   time of day?

24            THE WITNESS:  It was in the afternoon.

25   Q.  Do you know what day it was?

```
 1   A.  No.

 2            MR. CHONG:  Your Honor, I have nothing further.

 3            MR. MARLBOROUGH:  Nothing further from plaintiffs,

 4   your Honor.

 5            THE COURT:  Thank you, sir.  You're excused.

 6            THE WITNESS:  Thank you.

 7            THE COURT:  Thank you.

 8            Anything further?

 9            MR. MARLBOROUGH:  Your Honor, plaintiffs would like to

10   call Mike Memon to the stand.

11            THE DEPUTY CLERK:  Mr. Memon, stand and raise your

12   right hand.

13            You do solemnly swear that the testimony you shall

14   give this court in this issue now shall be the truth, the whole

15   truth, and nothing but the truth, so help you God?

16            THE WITNESS:  I do.

17            THE DEPUTY CLERK:  Please state your full name and

18   spell your first name and last name slowly for the record.

19            THE WITNESS:  They call me Michael.  Michael Memon,

20   last name.

21            THE DEPUTY CLERK:  Spell your first name.

22            THE WITNESS:  M-i-c-h-e-a-l, Michael.  M-e-m-o-n.

23            THE DEPUTY CLERK:  Thank you, Mr. Memon.  Please be

24   seated.

25
```

1                    DIRECT EXAMINATION

2    BY MR. MARLBOROUGH:

3    Q.   Mr. Memon, what do you do for a living?

4    A.   What I do?  I manage a business.

5    Q.   What is that business?

6    A.   It's the 99-Cent Store.

7    Q.   How many 99-Cent Stores do you manage?

8    A.   I have at least 12 stores.

9    Q.   12?

10   A.   12.

11   Q.   You've manage these stores for many years; is that correct?

12   A.   Some, yes.

13   Q.   How many years?

14   A.   No, not all.  I buy, sell.  Some of the stores we just

15   finish, so we get rid of.

16   Q.   How many years did you manager Bergen Discount?

17   A.   A few years.

18   Q.   More than 10 years?

19   A.   Yes.

20   Q.   All told, do you have approximately 100 employees?

21   A.   Excuse me?

22   Q.   Do you have 100 employees?

23   A.   100?  More or less.

24   Q.   Did you manage these stores with your business partner,

25   Mohamed Doria, correct?

 1   A.   I don't have partner.

 2   Q.   Did you work with Mohamed Doria?

 3   A.   He used to work for me.

 4   Q.   He was your employee?

 5   A.   Yes, sir.

 6   Q.   What was his job?

 7   A.   Buying merchandise.

 8   Q.   Mohamed passed away in August, 2014; is that right?

 9   A.   Correct.

10   Q.   Do other members of Mohamed's family currently work with

11   you?

12   A.   Yeah.  These guys are working.  Some of them are family,

13   yes.  But not close family, you know, the brothers.  Just the

14   brother and brother-in-law, not son and daughters.

15   Q.   Gulan Doria, is he a manager at the stores?

16   A.   He works for me.

17   Q.   And he's a manager of the stores?

18   A.   You know, you say manager.  You know, because if you give

19   some authority, it calls manager, you know?

20   Q.   So do you give authority?

21   A.   Sometimes I give him the authority.

22   Q.   Does he control the hours that people work?

23   A.   He doesn't control.  I said I give him some authority when

24   I'm not there.

25   Q.   Does he decide hours for people's work when you're not

1    there?

2    A.   Maybe, may not be.

3    Q.   How about Salim Doria?

4    A.   Yeah, he also work for me.

5    Q.   Does he have control over people's hours?

6    A.   No, he doesn't.

7    Q.   How about Sikander Doria?

8    A.   No, he doesn't.

9    Q.   Does he work for you?

10   A.   He work one of the stores.

11   Q.   He works one of the stores?  Which store is that?

12   A.   99-Cent.

13   Q.   What does he do there?

14   A.   Same thing like salespeople too; selling stuff in store,

15   pricing, fixing.

16   Q.   So he's a stock boy.

17   A.   (Non-verbal response)

18   Q.   Salim Doria.  You know that Salim Doria called Kamal Passa

19   to get him to withdraw the case, right?

20   A.   Excuse me?

21   Q.   You know that Salim --

22          MR. CHONG:  Your Honor, objection.

23          THE COURT:  Wait.  Just a second.  Let's have the

24   question again, please.

25   Q.   Do you know that Salim Doria called Kamal Passa to get him

 1   to withdraw the case?

 2               MR. CHONG:  Objection.

 3               THE COURT:  Overruled.

 4               THE WITNESS:  I don't know.

 5   Q.  Is that something that a stock boy would do?

 6   A.  Did I tell him to do the same thing?  Taking the pricing,

 7   making the pricing, taking the delivery, that's all.

 8   Q.  Would a stock boy call someone to get them to withdraw from

 9   the case?

10   A.  I don't know.

11   Q.  You don't know if a stock boy would do that?

12               MR. CHONG:  Objection, your Honor, asked and answered.

13   Let's go.

14               THE WITNESS:  I don't know about this matter.

15   Q.  Usman Doria is a manager, isn't he?

16   A.  He work.  He take the loading and unloading, not the

17   manage.

18   Q.  Does he do the interrogating?

19   A.  Excuse me?

20   Q.  Is he responsible for interrogating workers?

21               MR. CHONG:  Objection, your Honor.

22               THE COURT:  Overruled.

23               THE WITNESS:  What you say?  Excuse me?

24   Q.  Is he responsible for interrogating workers at the Discount

25   Stores?

```
 1    A.  He's part of the employees, you know.

 2    Q.  You heard the tape with Mr. Tebogo, correct?

 3    A.  Yes, sir.

 4    Q.  Is that a tape of your voice?

 5    A.  I'm not sure.  I don't recall.

 6    Q.  Do you recall that conversation?

 7    A.  I heard from you.

 8              THE COURT:  I'm sorry.  Your response?

 9              THE WITNESS:  I don't recall.

10    Q.  Did you recognize your voice on the tape?

11    A.  I don't recall.  I'm not sure.

12    Q.  Did you recognize Usman Doria's voice on the tape?

13    A.  I'm not sure, either.

14    Q.  Did you recognize Keletso Tebogo's voice on the tape?

15    A.  I heard, but I'm not sure, either.

16    Q.  Did you recognize Maddi Nasoco's voice on the tape?

17    A.  I'm not sure.

18    Q.  Were you present at a hearing before Judge Sullivan in

19    another courtroom on this case?

20    A.  Yes, I was.

21    Q.  Were you present when your lawyer informed the judge that

22    you do not recognize anyone on the recording?

23    A.  I'm not sure.

24    Q.  Would that have been a true statement at the time?

25              MR. CHONG:  Objection, your Honor.
```

 1              THE COURT:  Overruled.

 2              THE WITNESS:  I don't recall.

 3   Q.  Whoever that person was on the tape who said, "You stab us

 4   in the back us," that person didn't sound like they were doing

 5   the job of a delivery boy, did they?

 6              THE COURT:  Sustained.

 7              MR. CHONG:  Thank you.

 8   Q.  Those people didn't sound like they were afraid to talk

 9   about the lawsuit, did they?

10              MR. CHONG:  Objection.

11              THE COURT:  Sustained.

12              THE WITNESS:  I don't recall.

13              MR. CHONG:  Thank you.

14   Q.  Musajee Vawda was a manager also at the stores?

15   A.  Nobody is a manager of family.  I gave them authority.

16   Somebody do one job, the other guy do the other job like this,

17   you know.  Like Musajee do the buying, buying of the

18   merchandise.

19   Q.  So you do the schedules for all of the workers?

20   A.  He ask me what to buy, what not to buy, then I give him

21   authority to buy and not to buy, depending upon the

22   circumstances.

23   Q.  Who does the schedules for all the workers?

24   A.  No.

25   Q.  Who does the schedules for all the workers?

1    A.  Everybody -- you know, sometimes I do the schedules.

2    Q.  Okay.  Do any of these other people that we talked about do

3    workers' schedules?

4    A.  I do.

5    Q.  Just you.  So are you solely responsible for workers'

6    schedules?

7    A.  You know that once you allocate the hours or something,

8    it's keep ongoing.  It's not every day that you have to change

9    the hours.

10   Q.  A lot of the workers in this case say that their hours were

11   changed; isn't that right?

12   A.  Depending upon the circumstances.

13   Q.  Who is Siraj Bhayiat?

14   A.  He's also working in the store.

15   Q.  Is he a regular employee?

16   A.  He just started last week.

17   Q.  Is he on the same level as the 30 people that are here

18   behind us?

19   A.  Correct.

20   Q.  He's on the same level of employment as the 30 people that

21   came to this hearing?

22           MR. CHONG:  Objection, your Honor.

23   Q.  Do you know if he's a plaintiff in the lawsuit?

24   A.  Some I know, some I don't.

25   Q.  Do you know if Siraj Bhayiat is a plaintiff in a lawsuit?

 1   A.  No, he's not.

 2   Q.  Did you talk to Siraj Bhayiat about the lawsuit?

 3   A.  Everybody knows about this matter.  It's not hidden.

 4   Q.  Is there an order prohibiting you from talking to --

 5   A.  Everybody know this is already that going on.

 6   Q.  Is there an order prohibiting you from talking to employees

 7   about the lawsuit?

 8   A.  I don't talk, but it is already -- you know.

 9   Q.  Have you talked to Siraj Bhayiat about the lawsuit?

10   A.  No, I don't.

11   Q.  You don't.  Did Siraj Bhayiat attend hearings with you in

12   this case?

13              Is Siraj Bhayiat here right now?

14   A.  He is here.

15   Q.  He is.  Can you show me where he is?

16   A.  See, he's shaking hand?

17   Q.  Is that on the side with all the other defendants?

18   A.  Yes, correct.

19   Q.  And he's a regular employee.

20   A.  Not regular employee, but on and off.

21   Q.  And you don't talk to him about the lawsuit.

22              MR. CHONG:  Asked and answered multiple times.

23              THE COURT:  Sustained.

24   Q.  Did he come to you to a mediation session in this case?

25              MR. CHONG:  Objection, your Honor.  That's mediation.

 1    That's confidential.

 2              THE COURT:  Sustained.

 3              MR. CHONG:  It doesn't have relevance.

 4    Q.  Is Sofiya Manjra involved in the management of the

 5    business?

 6    A.  Not.

 7    Q.  Does anyone from the Doria family look out for the interest

 8    of Sofiya Manjra with respect to the businesses, the Discount

 9    Stores?

10    A.  No.

11    Q.  You know you can't talk about the lawsuit and talk to

12    plaintiffs about the lawsuit, right?

13    A.  Why should I talk to lawsuit for everybody?  You said I

14    talk to lawsuit.  I don't talk to lawsuit.

15    Q.  Usman Doria, Musajee, Sikander, Salim, Siraj, Gulan, they

16    can't talk to the workers about the lawsuit either; is that

17    right?

18    A.  I don't know.

19              MR. CHONG:  Objection, your Honor.

20    Q.  They're all related to Mohamed Doria?

21    A.  Some are close and some are distant.

22    Q.  Have you ever been sued in a federal lawsuit as a

23    codefendant with Mohamed Doria before?

24              MR. CHONG:  Objection, your honor.  Relevance.

25              THE COURT:  Overruled.

1          THE WITNESS:  I --

2          THE COURT:  Do you understand the question?

3          THE WITNESS:  I don't recall.

4  Q.  You don't recall?  Do you recall telling a federal judge

5  that you don't speak English?

6          MR. CHONG:  Objection, your Honor.

7          THE COURT:  Overruled.

8          THE WITNESS:  I speak English.

9  Q.  Do you recall telling a federal judge that your name is not

10  Mike Memon?

11  A.  Excuse me?

12  Q.  Do you recall telling a federal judge that your name is not

13  Mike Memon?

14  A.  Yeah.  My name is -- in the store they call me Mike Memon.

15  Q.  So if someone gave you a document that said Mike Memon on

16  it, you would know that that was for you.

17  A.  Because most -- ever since they used call me Mike in the

18  store.

19  Q.  You came to this court in May, 2015, correct?

20  A.  Correct.

21  Q.  Were you here when the lawyers went into that room over

22  there to talk with the judge?

23  A.  Yes.

24  Q.  Was that about a temporary restraining order to prohibit

25  you from communicating with the plaintiffs about the lawsuit

F9UQAGRH                    Memon - Direct

 1    and retaliating against them?

 2    A.  I don't remember it.

 3    Q.  Do you remember that that's an issue in this case?

 4    A.  No, I don't remember.

 5    Q.  So you don't know if there's an order preventing from

 6    communicating with workers about the lawsuit?

 7    A.  I know about the lawsuit, but I don't go into the deep.

 8    Q.  And you never received a copy of any order telling you that

 9    you cannot communicate with workers in the lawsuit?

10    A.  I don't recall.

11    Q.  You were at the hearing with Judge Sullivan when Judge

12    Sullivan personally told you that you cannot communicate with

13    any workers former or current employees about the lawsuit?

14    A.  I don't recall.

15              MR. CHONG:  Asked and answered.

16              THE COURT:  Overruled.  I'm sorry.  Your answer?

17              THE WITNESS:  I don't remember.

18    Q.  That was just on June 2nd, 2015.

19    A.  Got it.

20    Q.  Does that help jog your memory?

21    A.  Yeah, I remember.

22    Q.  So you do remember?

23    A.  No, I don't remember the specific you talk now.

24    Q.  Do you know why you were there that day?

25    A.  I have hard of hearing, that's why, you know?

1    Q.  Oh.  Do you know why you were there that day?

2    A.  I don't remember.

3    Q.  Was Siraj with you that day?

4    A.  I hope so.

5    Q.  And he's a stock boy?

6    A.  Who?

7    Q.  Did you bring any other stock boys with you that day?

8    A.  Who?  Excuse me?

9            MR. CHONG:  I'm going to object to --

10   Q.  You said Siraj was with you that day?

11           MR. CHONG:  I'm going to object to this line of

12   questioning.

13           THE WITNESS:  Yeah, I said hope -- I don't know --

14   hope he was.

15           THE COURT:  Overruled.

16   Q.  Did you bring any other stock boys with you to the court

17   hearing that day?

18   A.  No.

19   Q.  When you left that courtroom on May 12th, this very

20   courtroom, did you know that you weren't allowed to retaliate

21   against the workers?

22   A.  I don't remember.

23   Q.  Gulan Doria was with you at the court that day, right?

24   A.  I don't remember.

25   Q.  Siraj Bhayiat was with you, right?

 1   A.  Yeah, he was.

 2   Q.  There was another person with you too.  What's that

 3   person's name?

 4   A.  Who was it?  I don't remember who was with me.

 5   Q.  There were two plaintiffs at the courthouse also; is that

 6   right?

 7   A.  Two plaintiff?  I hope so, yeah.  I don't remember.

 8   Q.  Do you remember trying to have someone arrested on the

 9   courthouse steps?

10   A.  We didn't harass anybody.  We were walking on the street.

11   Q.  Do you remember trying to have anyone arrested on the

12   courthouse steps immediately after the judge issued a temporary

13   restraining order?

14   A.  I never harass anybody.  I never arrested anybody or

15   something like that.  It's your mistake.

16   Q.  Did anyone in your group on the courthouse steps say that

17   they were going to try to have someone arrested?

18   A.  Absolutely no.

19   Q.  Did anyone in your group on the courthouse steps say to the

20   plaintiff's lawyer, Adam Slater, "We know where you live?"

21   A.  Absolutely no.  I don't know.

22   Q.  Do you know where Adam Slater lives?

23   A.  I don't know.

24   Q.  Did anyone in your group, immediately after the Court

25   issued the temporary restraining order on May 12th, say to any

1  of the workers on the courthouse steps that he was going to F

2  them up, or, "We are going to F you up?"

3  A.  I don't recall it.

4  Q.  Do you recall any incident on the courthouse steps?

5  A.  I don't know.

6  Q.  Do you know who Carlos Laguna is?

7  A.  Yeah.  He used to work for me.

8  Q.  And you fired him, right?

9  A.  I never fired him.  Nothing.  He took the money and never

10 show up, and he is under arrest.

11 Q.  He has been arrested?

12 A.  The police is looking for him.

13 Q.  Oh, the police are looking for him.

14 A.  Because he change his address from one place to another.

15 Q.  This is Carlos Laguna.  And was he terminated as an

16 employee of yours?

17 A.  Excuse me?

18 Q.  Was he fired from his job?

19 A.  I said I never fired him.

20 Q.  Was he fired?

21 A.  Never.

22 Q.  By nobody.

23 A.  Nobody.

24 Q.  Did he quit his job?

25 A.  Yes.  Because he and his brother-in-law took the money from

 1   the store, and run away, and we call the police, police is

 2   still looking for them.

 3   Q.  Roberto Rodriguez.  Do you know who that is?

 4   A.  Yes, I do.

 5   Q.  Who is that?

 6   A.  He used to work as a loading and unloading guy.

 7   Q.  Did you attempt to have him arrested?

 8   A.  He took out the knife, and he tried to punch him, one of

 9   the employees.  The police came, and he says, "Who is the

10   owner?"  I was present at that time.  And they took my

11   statement, the police, the officer.  And I said that he took

12   out the knife, therefore, he's supposed to be arrested.  So

13   they told me to, you know, get rid of this guy.

14   Q.  Oh, they told you to fire that person?

15   A.  Yes.

16   Q.  And as a good corporate citizen, you obeyed the order of a

17   law enforcement officer and fired him; is that correct?

18   A.  It was a danger for the store.

19           MR. CHONG:  Objection to that question.

20           THE WITNESS:  Because this guy took out the knife from

21   his pocket, the next day the other guy gonna do the same thing.

22   That's why we had to clean the -- it's best like that.

23   Q.  How many workers have you tried to have arrested?

24   A.  Two guys.

25   Q.  How many of those workers are plaintiffs in this lawsuit?

1   A.   Around 30, 40.

2   Q.   How many of the workers that you have tried to have

3   arrested?

4   A.   None.  Only two guys.

5   Q.   Is Daniel Rodriguez a plaintiff in this lawsuit?

6   A.   Rodriguez.  Yeah, I think.

7   Q.   Did you try to have him arrested?

8   A.   Excuse me?

9   Q.   Did you try to have him arrested?

10  A.   No, I didn't.

11  Q.   Did you get pictures of yourself with the police officers

12  when they came to investigate this alleged knife incident?

13  A.   Yes, I did.

14  Q.   Did you say, "The lawsuit is over?"

15  A.   No, I didn't say that.

16  Q.   Did you say, "The case is over?"

17  A.   No, the case is not over.

18  Q.   What was the purpose of posing with police officers?

19  A.   As a proof.

20  Q.   Proof of what?

21  A.   You know, in the future, it might help us.

22  Q.   Help you do what?

23  A.   That these guys took out the knife in front of the other

24  guys.

25  Q.   What would it help you if --

 1   A.  Just for record purpose.

 2   Q.  Did you or anyone in your group take pictures on the

 3   courthouse steps, or record any audio or video on the

 4   courthouse steps?

 5   A.  I don't remember.

 6             MR. CHONG:  Objection.

 7   Q.  Right after the temporary restraining order was issued?

 8   A.  I don't remember and I don't recall.

 9   Q.  So are you trying to have two people arrested in

10   relationship to this theft that you talked about?

11   A.  Excuse me?

12   Q.  How many people are you trying to have arrested in

13   connection with the theft from the store?

14             MR. CHONG:  I think we covered these questions, your

15   Honor.

16             THE WITNESS:  You keep on asking same question.  I

17   said I don't recall.

18   Q.  That's a different question.

19             Okay.  Carlos Laguna.  Is that a person that you're

20   trying to have arrested in connection with a theft from the

21   store?

22   A.  Right.  Because he and his brother-in-law took the money

23   from the store.

24   Q.  Are you trying to have his brother-in-law arrested, also?

25   A.  Yes, I am trying.

1    Q.  And those are two people, right?

2    A.  Yes.

3    Q.  What about the knife person?  Were you trying to have the

4    knife person arrested?

5    A.  No.

6    Q.  You're not trying to have the knife person arrested.

7    A.  Who is the knife person you are talking about?

8    Q.  The one where the police came and you posed for pictures

9    with them.  Did you try to have that person arrested?

10   A.  He didn't arrest him.

11   Q.  Did you try to get him arrested?

12   A.  No, I didn't try nothing.  I was standing next to the

13   police, and he took the report from that guy.

14   Q.  You didn't want to have charges pressed against this

15   person?

16   A.  I didn't involve it, because I don't recall all these

17   things.  Just he fill out the form, and then he went.

18   Q.  If someone said to you that they know where you live, would

19   you take that as a threat?

20   A.  Excuse me?

21   Q.  If someone said that they know where you live, they shout

22   at you, "We know where you live," would you take that as a

23   threat?

24   A.  I don't remember.  I don't recall.

25   Q.  How about if it was four guys that were doing it?  A gang

1    of four guys said, "We know where you live."  Would you worry

2    for the safety of yourself and your family?

3              MR. CHONG:  Objection to this line of questioning.

4              THE COURT:  Overruled.

5              THE WITNESS:  I don't recall that.

6    Q.  You don't recall.

7              If a gang of four guys threatened to F you up, would

8    you take that as a threat?

9    A.  Why they would tell me like this?

10   Q.  I'm asking you a question.  The answer is a yes or no.

11   Would you take that as a threat if a gang of four guys

12   threatened to F you up?

13   A.  If you are in a Bronx area, a dark area, it's a threat.

14   But if you are in Queens or Manhattan, it's not a threat.

15   Q.  How about outside of a courthouse where people are expected

16   to act in a civil manner and not like an animal on the street?

17   In that case would you take it as a threat?

18             THE COURT:  Sustained.

19             MR. CHONG:  Thank you, your Honor.

20             THE WITNESS:  No threat.

21   Q.  How about in a courthouse, on the steps of a courthouse?

22   Would you take it --

23             THE COURT:  Sustained.

24             MR. CHONG:  Thank you, Judge.

25   Q.  Did you personally hire every single employee who works for

1  you?

2  A.  No, I never hire anybody yet.

3  Q.  You never hired anybody?

4  A.  I don't remember.

5  Q.  You don't remember.  Who hired the employees?

6  A.  I said I authorize some guys to do it.

7  Q.  You authorized who to do it?

8  A.  Mr. G, or some other guy who was available at that time.

9  Q.  Tell me the people who are authorized to hire employees.

10 A.  It is not a big corporation that, you know, that somebody

11 should be special for hiring person.

12 Q.  Is Keletso Tebogo authorized to hire employees?

13 A.  Mr. G usually hires the people because I authorize him.

14 Q.  Who is authorized to fire employees?

15 A.  Excuse me?

16 Q.  Who is allowed to fire employees?

17 A.  Who?

18 Q.  Who is allowed to fire someone?

19 A.  That someone -- you know, that guy, he just told me take

20 out the knife was fired.

21 Q.  Okay.  Who was allowed to fire him?

22 A.  Who was allowed?

23 Q.  Yes.

24 A.  We didn't allow it but, you know, because it's dangerous

25 for the store, that's why I told him that, "Don't come."

 1  Q.  Oh, so you fired him.

 2  A.  Right.

 3  Q.  Was Mohamed Doria authorized to hire and fire people?

 4  A.  He never work for me.  He was just doing the buying for the

 5  store.  He was not employed.

 6  Q.  You know who Luckenson Camille is, right?

 7  A.  Excuse me?

 8  Q.  You know who Luckenson Camille is, right?

 9  A.  I don't remember who this is.

10  Q.  He's the person that threatened Josue Pierre-Lewis to have

11  him deported.

12  A.  Maybe his name is different.  You know.

13  Q.  Are you aware of any efforts to have Josue Pierre-Lewis

14  deported or threatened with deportation?

15  A.  No.

16  Q.  Have you been trying to get immigration documents from the

17  plaintiffs or from third parties about the plaintiffs?

18  A.  Not really.

19  Q.  Not really?

20  A.  I don't recall it.

21  Q.  Do you recall any instances where you attempted to obtain

22  immigration documents about the plaintiffs?

23  A.  No.

24  Q.  How about a green card from Keletso Tebogo's green card?

25  A.  I'm not.

1  Q.  How about demanding a passport from Joseph Kofei?

2  A.  I don't recall.

3  Q.  Do you know who Joseph Kofei is?

4  A.  Now I know.  Before, his name was different.

5  Q.  So you recognize him from a document that we submitted in

6  this case; is that right?

7  A.  Yes.

8  Q.  Do you recognize all those people that you say you didn't

9  know?

10  A.  Yeah.  Because in the store --

11         MR. CHONG:  Object to form.

12         THE WITNESS:  -- they give you different name, and

13  then they don't present their social security or nothing.  Now

14  we know, because my attorneys send me the picture of these guys

15  with different name.

16  Q.  So now there are none of the plaintiffs that you do not

17  recognize; is that correct?

18  A.  The name when we hired, they use a different name.  Now,

19  some of the people I know, because now I got the correct name

20  and the correct pictures.

21  Q.  Did you cut a lot of workers' hours lately?

22  A.  Excuse me?

23  Q.  Have you cut a lot of workers' hours in the last three

24  months?

25  A.  Across the board I cut many people's hours because of the

1   lagging business activities.

2   Q.  But you're hiring new employees to work full schedules,

3   aren't you?

4   A.  Because those ladies are forcacious (ph), and they are some

5   pregnant, they moved out, so I replace with the good ladies who

6   can run the cash register.

7   Q.  Are you cutting hours of people who are not plaintiffs in

8   this lawsuit?

9   A.  I told you, because the business activities is lagging,

10  they're declining, that's why we have to reduce the workers.

11          I want to fire the people, but since -- I don't want

12  to fire them because I don't want that they go hand to mouth.

13  You know.  They can survive.

14  Q.  Name some of the current employees who are not plaintiffs

15  in this lawsuit who have had their hours cut.

16  A.  Across the board I, you know, slightly reduce the hours.

17  Not every -- not fully, but I reduce slightly hours.

18  Q.  Can you name those people?

19  A.  No.  I have so many people, now you want me to give you

20  this list?

21  Q.  Yes.

22  A.  All these first people's hours cut.

23  Q.  Let me give you a list from the plaintiffs side.

24          Keletso Tebogo, did you cut his hours?

25  A.  Yes, I --

1   Q.  Joseph Kofei, did you cut his hours?

2   A.  Yes.

3   Q.  Ron Agyemang, did you cut his hours?

4           THE COURT:  Let's not waste a lot of time.

5   Q.  You treat workers who are plaintiffs in the case

6   differently than you treat workers who are not plaintiffs in

7   the case; isn't that right?

8   A.  Not right.

9   Q.  Do you require workers who are plaintiffs in the case to

10  sign for their pay as of last week?

11  A.  I don't remember.

12  Q.  But workers who are not plaintiffs in the case don't have

13  to sign for their pay?

14  A.  It's not true.

15  Q.  Do workers who are not plaintiffs in the case have to sign

16  for their pay?

17  A.  According to the Labor Department, they issue new rules

18  that everybody has to sign the paper for coming in and going

19  out.

20  Q.  So do workers who are not part of the lawsuit have to sign

21  for their pay?

22          MR. CHONG:  Asked and answered.

23          THE COURT:  Overruled.

24          THE WITNESS:  What is it, please?  Excuse me?

25  Q.  Do workers who are not part of the lawsuit have to sign for

 1   their pay?

 2   A.   Everybody has to do.  We are trying our best to get

 3   everybody into the attending book.  This is a new labor law.

 4   Q.   Have you received any letters of apology from any of the

 5   plaintiffs in this case apologizing for inconveniencing you by

 6   participating in a lawsuit?

 7   A.   One of the guys send me one letter the other day, attention

 8   mine.  You have seen the letter.  You were circulating it.

 9   Q.   Is that Christopher Bruce?

10   A.   Correct.

11   Q.   Is that a letter that you received?

12   A.   Yes.

13   Q.   Is that a letter that you received from Christopher Bruce?

14   A.   Correct.

15            MR. MARLBOROUGH:  Your Honor, I'd like to admit that

16   into evidence, Plaintiff's Exhibit 3.

17            THE COURT:  Yes, it's admitted.

18   Q.   Did any other workers submit a letter of apology to you --

19   A.   No.

20   Q.   -- for inconveniencing you by participating in the lawsuit?

21   A.   I don't remember.

22   Q.   Did Maddi Nasoco give you such a letter?

23   A.   I don't remember.

24   Q.   Do you know someone named Police?

25   A.   I don't remember.

F9UQAGR1                        Memon - Direct

1    Q.  How about Wilson Tenuda?

2    A.  I don't.

3    Q.  How about Marcelin Auguste?

4    A.  I don't remember.

5    Q.  Do you know that Marcelin Auguste was recently promoted?

6    A.  I don't remember.

7    Q.  Do you know that Marcelin Auguste filled the position off

8    Alioune Diagne, who is a plaintiff in this case?

9    A.  Nobody's demoted or promoted.  I am just telling you that

10   that depend upon the economic situation.  When we don't have a

11   big delivery, then nothing, we have to cut hours to survive.

12   Q.  Was Alioune Diagne recently terminated?

13   A.  Because of it's a relative, I have to make the adjustment.

14   If I don't do that, I will be out of business next day.  You

15   know, the corporation also filing and, you know, laying off the

16   people.  I'm not laying off the people, I'm just reducing in

17   order for the living so they can survive.

18            MR. MARLBOROUGH:  Your Honor, this document that we've

19   admitted into evidence, the Christopher Bruce letter, I think

20   it was Plaintiff's Exhibit 4, I'd like to show it to the

21   witness, if I may.

22            MR. CHONG:  That was premarked as 3.

23            MR. MARLBOROUGH:  Premarked as 3.  All right.

24   Q.  I'm going to ask you to take a look at this letter.  Can

25   you read the substance of that letter to me?

 1          THE COURT:  No, read it to yourself.  Any questions?

 2          MR. MARLBOROUGH:  Yes.

 3  Q.  Do you recognize the notary signature on that letter?

 4  A.  Yeah.

 5  Q.  Do you know the name, who that person is?

 6  A.  No, I don't.

 7  Q.  Alioune Diagne was recently terminated; is that correct?

 8  A.  Who?

 9  Q.  Alioune Diagne?

10  A.  I don't remember.

11  Q.  How about Marcelin Auguste?  We talked about him getting a

12  promotion.

13  A.  Who?

14  Q.  Marcelin Auguste.

15  A.  What is his real name?  I don't know the name but, you

16  know, what he's called in the store?

17  Q.  Do you --

18  A.  The others use their own name because for the benefit

19  cards.

20  Q.  How many of these workers are cheating you, or cheating?

21  How many of these workers are cheating?

22  A.  All the employees, they get these food coupons, they get

23  the housing benefits, they get the food coupons, and then they

24  give us the wrong name so that they can get all the benefits

25  from the government, plus they get the money from us.  So, you

1   know, they make more money than ordinary people.

2   Q.  Why do you even hire these criminals?

3   A.  I ask them to show me the social security.  They said they

4   don't have a card.  They are illegal.

5   Q.  Why do you hire them?

6   A.  Because I need.  I have to run my business.  I don't ask

7   them to come to my store, they come by themselves and crying

8   for the job.  I don't beg them and go their house, "Oh, come

9   on.  Let's have a work."

10  Q.  Do you know Mamadou Diallo?  Do you know Mamadou Diallo?

11  A.  I know him.  He used to work, yes.

12  Q.  He's a former employee?

13  A.  Yes.

14  Q.  When was the last time you saw Mamadou Diallo?

15  A.  Huh?

16  Q.  When was the last time you saw Mamadou Diallo?

17  A.  Two, three weeks ago.

18  Q.  How long ago did he work for you?

19  A.  Very short time.  Two, three months, something like that.

20  Q.  Did you tell him that it is forbidden by Allah for him to

21  accept the money --

22  A.  Excuse me?

23  Q.  -- from the lawsuit?

24          Did you tell him it was forbidden by Allah for him to

25  accept money in this lawsuit?

F9UQAGR1                        Memon - Direct

1    A.  I don't remember.

2    Q.  You told him that money was haram, didn't you?

3    A.  I don't remember.

4    Q.  Can you tell me what haram means?

5    A.  Excuse me?

6    Q.  What is haram?

7    A.  I don't remember.

8    Q.  Is that a word of Muslim --

9    A.  You asking any question which I don't remember, and he make

10   many things in the letter.

11   Q.  So I'm going to back up, and I apologize.

12           Haram, my understanding is, is a foreign language word

13   that I do not know.  Can you tell me the meaning of the word

14   haram?

15   A.  He never told me nothing.  He never talked to me.  How

16   could he said that -- did he tell me -- he never told me

17   nothing.  Haram.  Allah.

18   Q.  Do you know the meaning of the word haram?

19   A.  I know the word, but he never talked to me.

20   Q.  What does the word mean?

21   A.  Means, you know, it's not honest money.

22   Q.  Not honest money.

23   A.  Dishonest.  To make money dishonestly.

24   Q.  Do you think it's dishonest for a worker to be paid minimum

25   wage?  Is that honest money?  If a person works and they get

 1    minimum wage, is that honest money?

 2    A.  You know that you are asking such a funny question.  I

 3    didn't ask --

 4            THE COURT:  We're dealing with a contempt, right?

 5            MR. MARLBOROUGH:  Yes, your Honor.

 6            THE COURT:  We're not proving the case, right?

 7            MR. MARLBOROUGH:  Your Honor --

 8            MR. CHONG:  Thank you, Judge.

 9    Q.  Did you offer to give Mamadou Diallo a truck if he stayed

10    out of the lawsuit?

11    A.  I don't remember, and he's a liar.  He's a big liar, Moma

12    Didiolo.  He make big, big stories.

13    Q.  Ah.

14            MR. MARLBOROUGH:  No further questions, your Honor.

15            MR. CHONG:  Just a few questions, Judge.

16                        CROSS EXAMINATION

17    BY MR. CHONG:

18    Q.  Mr. Memon, has there been a downturn in your business in

19    the last three years?

20    A.  Excuse me?

21    Q.  Has there been a downturn in your business?

22    A.  It has been downturn for a long time, you know?  I don't

23    know how we are surviving.

24    Q.  As a result of this downturn in your business, did you have

25    to reduce hours of employees?

1   A.   Yes.   Across the board I reduce the hours for many guys.

2   Q.   When you say "across the board", it applies to everybody,

3   correct?

4   A.   Almost.

5   Q.   Everybody?

6   A.   Not everybody, most of the guys.   Because let's say, before

7   we used to get 100 percent delivery, now we are not getting

8   100 percent delivery.   So naturally, those people who do the

9   loading and unloading job, we reduce the hours.

10  Q.   So are you reducing the hours of employees to retaliate

11  against them?

12  A.   Not true.

13  Q.   Why don't you just fire these employees if you don't like

14  them?

15  A.   I wish I could fire them, but because of their living, you

16  know, I don't want to hurt these people.   I think everybody

17  should survive.

18  Q.   Do you feel that some of these workers are taking advantage

19  of this lawsuit?

20  A.   I thought so.

21  Q.   Well, are they taking advantage of this lawsuit by not

22  performing their duties at the job?

23  A.   Yeah.   Right now, since this lawsuit occur, that these guys

24  are not doing their proper job, and they don't do efficiently

25  like they used to work.

1  Q.  Are you afraid to speak to them because you're afraid they

2  might claim retaliation?

3  A.  Exactly.

4  Q.  The plaintiffs' counsel played a tape earlier.  We all got

5  a chance to listen to the tape.

6       Mr. Tebogo testified that he walked into your office

7  with his phone recorder in his pocket and he recorded this

8  conversation between you, himself, I believe Usman Doria, and a

9  Mr. Nasoco.  Do you recall this conversation?

10 A.  I don't remember when was that.

11 Q.  Did you ever ask any of your employees to sign some type of

12 document stating that they don't want to join this lawsuit?

13 A.  No, I don't recall it.

14 Q.  When you reported that incident to the police, that knife

15 incident that you testified about concerning, I think it was

16 Daniel Rodriguez, your purpose was to prevent somebody from

17 being harmed at your store, correct?

18 A.  Exactly.

19 Q.  Christopher Bruce, and they sometimes call him Jerry.  You

20 know, there's been testimony today that you've pressured

21 Christopher Bruce to withdraw from this lawsuit and submit this

22 letter to you, this apology letter, Plaintiff's Exhibit 3.  Is

23 that true?

24 A.  It's not true because I never met Bruce.

25 Q.  Okay.

1   A.  Yes.

2   Q.  Has anybody else sent you apology letters similar to

3   Mr. Bruce?

4   A.  I don't remember.

5   Q.  Mr. Memon, you recall that in May -- I think it was

6   May 21st -- you came to court with me to appear before Judge

7   Sweet, correct?

8   A.  Correct.

9   Q.  After that, when we left the courthouse, the Judge gave

10  certain instructions, an order, correct?

11  A.  Correct.

12  Q.  Okay.  I discussed that order with you, correct?

13  A.  Correct.

14  Q.  Didn't I instruct you that, pursuant to that order, you're

15  not to discuss this lawsuit with any of the employees, correct?

16  A.  Correct.

17  Q.  Did you follow that order?

18  A.  Correct.

19  Q.  Mr. Memon, there's been testimony, and it's in their

20  plaintiffs' papers, that on that day that you and I walked out

21  of the courthouse, on the steps, that you and others that were

22  with you made threats to the plaintiffs walking out on the

23  stairs.  Is that true?

24  A.  It's not true.

25  Q.  Okay.

F9UOACH4                    Memon - cross

 1   A.  It's a false assert.

 2   Q.  Did you ever say anything to any of the plaintiffs while we

 3   were walking out of the courthouse?

 4   A.  No.  We were walking -- we were going out from the court.

 5   That's it.

 6   Q.  Did you yell out any profane statements to the plaintiffs,

 7   and plaintiff's counsel says there's one statement, "I'm going

 8   to F you up."

 9   A.  It's not true.

10   Q.  So you never made that statement to anybody.

11   A.  No.

12   Q.  Did you make any threatening statements to plaintiffs'

13   counsel, Adam Slater?

14   A.  No, I --

15   Q.  Did anybody in that group walking out of the courthouse

16   make a threat to Adam Slater?

17   A.  Never.

18   Q.  There is another employee that has been discussed, and he

19   was subject of an arrest warrant for stealing money from the

20   store, correct?

21   A.  Correct.

22   Q.  According to the police report, I want you to confirm it,

23   he stole $9,000 from your store; is that correct?

24   A.  Exactly.

25   Q.  Okay.

 1           MR. MARLBOROUGH:  Objection, your Honor.  I don't

 2     think the police report says that he stole $9,000.

 3           THE COURT:  Overruled.

 4     Q.  So what was that person's name, the employee's name?

 5     A.  Carlos.

 6     Q.  Carlos?  What's his last name?

 7     A.  Logan.

 8     Q.  So why did the police issue an arrest warrant for him?

 9     A.  Because he took the money and he run away.

10     Q.  How much was it?

11     A.  Police are looking for him, and he cannot be find.  That's

12     why he's under arrest.

13     Q.  Is the reason that he's under arrest or there's a warrant

14     for his arrest because you were retaliating against him?

15     A.  No.

16     Q.  There's some testimony earlier today that Josue

17     Pierre-Lewis.  That's a former employee of yours, correct?

18     A.  Correct.

19     Q.  Did you ever try to pressure him to withdraw from this

20     lawsuit?

21     A.  I don't.

22     Q.  No?

23     A.  I don't recall it.

24     Q.  Do you know if Gulan Doria ever tried to pressure Josue

25     Pierre-Lewis to withdraw from this lawsuit?

 1   A.   I doubt it.

 2   Q.   There's been some testimony and some questions stating that

 3   you and other, I guess, employees at the stores are

 4   interrogating employees.   Is that true?

 5   A.   False.

 6   Q.   And that's false because of that order, correct?

 7   A.   Correct.

 8   Q.   That order tells you not to talk to the employees, correct?

 9   A.   Correct.

10   Q.   There's been some testimony about the identification of

11   some of the workers.   Is it true that sometimes -- or in many

12   instances, workers give you a different name than the name that

13   they legally have?

14   A.   Exactly.

15   Q.   So it's fair to say that if somebody gives you their legal

16   name, you might not know them because they go by a different

17   name, like Jerry for Chris Bruce?

18   A.   They have a different benefit card and they have different

19   name on the social security number.   So they always show the

20   benefit card, so I assume that maybe this is their name.

21   Q.   So that could be the reason, that's the explanation why --

22   you know, you've been presented with many names in this

23   lawsuit, but it's very difficult to corroborate that name and

24   identify it as an employee, correct?

25   A.   Correct.   Because I always ask them to bring the social

 1    security number, and they said they are illegal immigrants.

 2    They don't have it.

 3    Q.  For instance, Joseph Kofei.  Is he sometimes known as

 4    Osmand?

 5    A.  I don't remember.

 6    Q.  Did you demote Keletso Tebogo?

 7    A.  Not really.  If I want, I want fire him, but I didn't fire

 8    nothing.  Because the business activities is reducing, this way

 9    I have to cut then the hours.

10    Q.  So rather than firing employees, you reduce their hours,

11    correct?

12    A.  Excuse me?

13    Q.  Rather than firing employees, you're reducing their hours.

14    A.  Hours, because everybody can survive.

15    Q.  Did you move Keletso from one store to another store?

16    A.  Excuse me?

17    Q.  Did you move Keletso Tebogo from one store to work at

18    another store?

19    A.  See, you know, that wherever we need people, we have to

20    move, you know.

21    Q.  So that's actually -- that's not -- your motivation wasn't

22    retaliation, right.  Let me finish my question.

23         Was your motivation to move Keletso Tebogo

24    retaliation?

25    A.  No, it is not.

 1  Q.  Have you hired any new employees?

 2  A.  We did.  Cashiers.

 3  Q.  How many cashiers?

 4  A.  Two, I think.

 5  Q.  Two?  Full-time, part-time?

 6  A.  Yeah, part-time mostly.

 7  Q.  Are they replacing the hours of any of the plaintiffs who

 8  have had their hours reduced?

 9  A.  Because this case shift, this lady that her cash register,

10  not for the working outside.

11  Q.  Okay.  So then --

12  A.  This is a different volume.

13  Q.  Different positions?

14  A.  Correct.

15  Q.  So they're not replacing anybody else's hours.

16  A.  No, they are not.

17  Q.  Do you know Israel Uduaghan?

18  A.  Yes, sir, I know.

19  Q.  Was he ever an assistant manager in your stores?

20  A.  Nobody is manager, everybody is a worker.

21  Q.  Were his hours reduced?

22  A.  It was not hours.  I just told you, the business activities

23  is -- so I have to move from one place to another in order to

24  survive, other than to fire them.

25  Q.  So the reason Israel -- and I'll just call him Israel --

1    Israel's hours would be reduced is because of the business

2    condition, correct?

3    A.   Correct.

4    Q.   Did you ever interrogate any workers about this lawsuit?

5    A.   Not true.

6    Q.   Did Gulan Doria ever interrogate any employees about this

7    lawsuit?

8    A.   Not true.

9    Q.   Did anybody who worked in management for the defendant

10   companies ever interrogate anybody about this lawsuit?

11   A.   Not true.

12   Q.   Sergio Recinos.  Do you know this person?

13   A.   Yes, sir.

14   Q.   Who is he?

15   A.   One of the worker.

16   Q.   Does he still work for you?

17   A.   Yes.

18   Q.   Is he a plaintiff in this lawsuit, to your knowledge?

19   A.   Yes.

20   Q.   Did you reduce his hours?

21   A.   Yes.

22   Q.   Why did you reduce his hours?

23   A.   Because, I told you, business activities are slow.  He

24   knows too.

25   Q.   Do you know who Miguel Rosendo is?

1   A.  Yes, I know.

2   Q.  There's been some papers submitted stating that Miguel

3   Rosendo went to the May 21st hearing, the hearing that was

4   going to be before Judge Sweet.  Do you recall if you saw him

5   there?

6   A.  I don't remember.

7   Q.  Miguel says he attended this hearing, and then when he went

8   back to his store, he was sent home because he went to the

9   hearing.  Is that true?

10  A.  It's not true.

11  Q.  Were Miguel Rosendo's hours reduced?

12  A.  Correct.  Others too.

13  Q.  Why were his hours reduced?

14  A.  Same, for business activities.

15  Q.  Mohamed Doria.  Was he your business partner?

16  A.  Not really.

17  Q.  Yes or no?

18  A.  No.

19          THE COURT:  No.

20          MR. CHONG:  Nothing further, Judge.

21          MR. MARLBOROUGH:  Nothing further from plaintiffs on

22  this witness.

23          THE COURT:  You're excused, Mr. Memon.

24          Anything further from the plaintiffs?

25          MR. MARLBOROUGH:  I'd like to call one more witness.

 1               THE COURT:  Not today.

 2               MR. MARLBOROUGH:  Okay.  Thank you, your Honor.  We'll

 3      rest, in that case.

 4               THE COURT:  Okay.  Thank you.

 5               I'll reserve decision.

 6               MR. CHONG:  Your Honor, would it be possible to make a

 7      post-hearing submission to the Court?

 8               THE COURT:  Sure.

 9               MR. CHONG:  Something short.  I don't plan on sending

10      you anything big.

11               THE COURT:  Sure.  When do you want to submit them?

12               MR. CHONG:  May I have seven days?

13               THE COURT:  Sure.

14               MR. CHONG:  Thank you, Judge.

15               THE COURT:  Anything else?

16               MR. CHONG:  No, sir.

17               MR. MARLBOROUGH:  Your Honor, I apologize.  I guess we

18      could make our request.  We're going to request a scheduling

19      conference that we haven't even gotten out of the gate with.

20               THE COURT:  We can do that later on.

21               MR. MARLBOROUGH:  We can do that through the papers.

22               THE COURT:  Right.

23               (Adjourned)

24

25